RAILROAD COMPANY *v.* MARYLAND.

1. A stipulation in the charter of a railroad company, that the company shall pay to the State a bonus, or a portion of its earnings, is not repugnant to the Constitution of the United States.

2. Such a stipulation is different, in principle, from the imposition of a tax on the movement or transportation of goods or persons from one State to another. The latter is an interference with and a regulation of commerce between the States, and beyond the power of the State to impose; the former is not.

3. The power of a State to construct railroads and other highways, and to impose tolls, fare, or freight for transportation thereon, is unlimited and uncontrolled. The disposition of the revenues thus derived is subject to its own discretion. But a State cannot impose a tax on the movement of persons or property from one State to another.

4. The cases of *Crandall* v. *State of Nevada* (6 Wallace, 42), and *Freight Tax Cases* (16 Id. 232), cited and affirmed.

5. Relief from onerous and burdensome rates of transportation imposed under State authority must be sought in the competition of different lines, and, perhaps, in the power of Congress to establish post roads and facilitate military and commercial intercourse between the different parts of the country.

6. The charter of the Baltimore and Ohio Railroad Company for constructing and working a branch railroad between Baltimore and Washington contained a stipulation that the company at the end of every six months should pay to the State one-fifth of the whole amount received for the transportation of passengers. This charter was accepted and complied with for many years. *Held,*

1st. That this stipulation was not repugnant to the Constitution of the United States.

2d. That it was a contract to pay, and not a receipt of money belonging to the State; and, if unconstitutional, the objection could be set up as a defence to an action brought by the State to recover the money.

3d. That as the alleged unconstitutionality of the stipulation was set up as a defence, the State court was bound to pass upon it; and having decided against the exemption thus claimed, this court is authorized to review the decision.

ERROR to the Court of Appeals of Maryland; the case being thus:

A statute of Maryland granted to the Baltimore and Ohio Railroad Company the right to make a branch or lateral road from Baltimore to Washington City, and of employing machinery and carriages thereon, for the transportation of freight and passengers.*  And it was further enacted,

"That the company shall be entitled to charge and take for conveying each person, the whole distance between the cities of Baltimore and Washington, not exceeding two dollars and fifty cents, and in proportion for every shorter distance.

"That the said company shall pay to the treasurer of the Western Shore of Maryland, on the first Monday in January and July in each and every year, for the use of the State, one-fifth of the whole amount which may be received for the transportation of passengers on said railroad by said company during the six months last preceding."

---

* An act of Congress (act of March 2d, 1831, 4 Stat. at Large, 476) gave authority to carry the branch from the line between Maryland and the District of Columbia into the city of Washington.

There were other statutes on the main subject, but this one presents the substance of the enactments.

This enactment was accepted, and the payment made for many years of one-fifth of $1.50, the fare asked. However, after a certain time the railroad company denied the constitutionality of the stipulation to pay, and refused further payment. Hereupon the State sued the company in one of the State courts of Baltimore.

The action was *indebitatus assumpsit*. The declaration contained two counts: the first for money due and payable, the second for money had and received. In answer to a demand of the defendant for a bill of particulars, the following was filed by the State.

"The claim is for the particulars following, viz.: For $500,000, being the one-fifth part of the whole amount of moneys received by the defendant for the transportation of passengers upon the Washington branch of the Baltimore and Ohio Railroad, from the 1st day of January, 1860, to the 1st day of January, 1870; which said sum of $500,000 was received by the defendant for the use of the plaintiff, and was due and in arrears to the plaintiff at the time of the institution of this action."

The defendant pleaded the general issue, and on that issue the case was tried.

The record showed that at the trial of the cause, after all the acts of Assembly constituting the charter referred to, and bearing on the question, had been submitted, the defendant, by his counsel, prayed the court to instruct the jury that these acts, so far as they provided that the defendant should pay to the treasurer of the Western Shore of Maryland, on the first Monday of January and July in each and every year, for the use of the State, one-fifth of the whole amount that may be received for the transportation of passengers on the branch road mentioned in said acts during the six months last preceding, were unconstitutional, because in conflict with the Constitution of the United States; and secondly, that the defendant was not estopped from setting up the defence.

The plaintiff, on the other hand, prayed the court to in-

struct the jury that even if the said provision was unconstitutional, still the defendant, by accepting the terms of the charter, was bound to pay to the State the one-fifth part of the passage-money in question.

The court granted the prayer of the defendant and refused that of the plaintiff, and a verdict and judgment were rendered for the former.

The Court of Appeals of Maryland reversed the judgment and awarded a *venire de novo.*

Upon the second trial the same instructions were asked by each party respectively, and the court below, in conformity with the decision of the Court of Appeals, refused the instruction asked for by the defendant and granted that asked for by the plaintiff, and a verdict and judgment were rendered for the latter. This judgment was affirmed by the Court of Appeals, and was now brought here under the assumption that it was within section 709 of the Revised Statutes,* the old twenty-fifth section of the Judiciary Act.

*Messrs. J. H. B. Latrobe* and *Reverdy Johnson, for the plaintiff in error.*

*The question is, were the statutes of Maryland and the contract made under them constitutional ?*

We submit that this question has been settled by this court in the case of *Crandall* v. *State of Nevada.*† That case arose upon an act of Assembly of Nevada. The act was thus:

" There shall be levied and collected a capitation tax of $1.00 upon every person leaving the State by any railroad, stagecoach, or other vehicle engaged or employed in the business of transporting passengers for hire."

This court pronounced the act unconstitutional.

Is there any essential difference between that act of Nevada and the Maryland act ?

1. In the Nevada case the effect was to make each passenger *leaving* the State pay $1.00 to the State. In the case at

---

* See the section in the Appendix.          † 6 Wallace, 35.

bar the effect was to make each passenger *entering* or *leaving* the State by the Washington branch road pay 30 cents, or one-fifth of $1.50.

The payment to the State is irrespective of the earnings of the company, out of which are defrayed the cost of running the road, &c., and a dividend to the stockholders; these are met by the $1.20, which is the company's share of the $1.50.

That the phrase " one-fifth of a given sum" is an accurate statement of the quotient resulting from dividing " the given sum " by five cannot, of course, be denied. The tax of $1.00, therefore, in Nevada, was not more specific than a tax of one-fifth of the gross receipts, when the fare was $1.50, in Maryland.

In the Nevada case the carrier was made the collector for the State; in the case at bar the company is made the collector, and required by the law to pay the tax to the State out of what it receives from the passenger.

In the Nevada case the legislation was general in its operation; in the case at bar it is special, being confined to a single company.

But the principle involved is independent of the number of carriers to whom the legislation is applicable. *The wrong done is to each particular passenger;* and the fact that the law is not uniform in its operation—that a portion only of the people who travel that portion, namely, who use a particular road, is affected by it—is not an argument in its favor.

If it is unconstitutional to exact payment from a person entering or leaving the State, the unconstitutionality cannot be evaded by the name that is given to the exaction; and the fact that in Nevada the law called the collection to be made from the passengers a capitation tax, and that in Maryland it is described as one-fifth of the gross receipts of the passenger traffic between Baltimore and Washington, can make no difference.

In the *Freight Tax Cases,** to which we refer as much in

---

* 15 Wallace, 273.

point, Mr. Justice Strong, delivering the opinion of this court, says:

"It has repeatedly been held that the constitutionality or unconstitutionality of a State tax is to be determined not by the form or agency through which it is to be collected, but by the subject on which the burden is laid."

2. Is there any distinction due to the fact that in the Nevada case the law *imposed* a tax, and in the case at bar the company *contracted* to pay the tax?

If, as we assume, the law is unconstitutional because of its exaction from the passenger, it can make no difference whether the State imposes the tax by a general law or whether it is the result of a special contract with the party receiving it in the first instance. If it is wrong, as the Nevada case has decided, for the State to impose such a tax, the wrong cannot be rectified by a contract in which the carrier agrees to pay it out of a gross fund. If the State cannot, of itself, make the traveller pay a portion of his fare into the State treasury, it cannot delegate to another the power to compel a payment that is, subsequently and circuitously, to find its way into it, unless indeed we are prepared to admit that the law can be simply evaded by the form in which those who collude to evade it may contract for the purpose.

The constantly recurring question is, "Is the charge one that increases the cost of transportation to the passenger for the use of the State, beyond what it would be were the fare regulated by circumstances irrespective of the State?"

That the company, after fixing the fare irrespectively of the tax, would pay the 30 cents per passenger out of it, cannot be supposed. Fixing the fare, the amount to be paid to the State out of the gross receipts, as a matter of course became a matter of consideration; and equally as a matter of course a sum was fixed, the deduction of 20 per cent. from which would still leave a remunerative compensation to the company, which becomes as much the collector for the State of the latter's 20 per cent. as the stage-owner in Nevada was

made the collector of the $1.00 there.    Had the stage-ownei been willing to pay the tax, he would have added the dollar to the fare of the passenger, exactly as the company here added 30 cents to the fare of passengers between Baltimore and Washington.

In the *State Freight Tax Cases,* already referred to, it is said, " In view of these provisions of the statute, it is impossible to escape from the conviction that the burden of tax rests on the freight (passengers) transported, . . . and that the company authorized to collect the tax and pay it into the State treasury is in effect only a tax-gatherer."

If, as just suggested, the form which the State and its creature, the railroad corporation, agree that the charter shall assume, is to settle the constitutionality of an exaction that the Constitution prohibits, and thereby preclude all inquiry by this court on behalf of the public, then the State of Maryland will have the doubtful merit of furnishing a form for the safe violation of law; taking the public from under the shield of this court and placing them at the mercy of the State and its corporations, who may collude to tax them.

*Messrs. P. F. Thomas, I. N. Steele, and S. T. Wallis, contra.*

I.  *No jurisdiction exists in this court, under section* 709, *to review the judgment below:  There is no " Federal question."*

The right of the State to recover from the company was placed upon grounds independent of the question of the constitutionality of the statutes.    The declaration contained two counts only; one " for money due and payable by the defendant to the plaintiff," and the other " for money had and received by the defendant for the use of the plaintiff." Neither of the prayers offered by the company impeached, or indeed referred or pointed to the pleadings; so that, according to the established Maryland rule, they conceded the right to recover on those pleadings, if the evidence established a right to recover at all.    But they set up and relied on the defence of the unconstitutionality of the statutes. The State in reply, by its prayers, claimed the right to re-

cover, even if the statutes should be held to be unconstitutional, and without regard to the question of constitutionality.

The company thereupon argued that the statutes imposed a tax on passengers and required the company to collect it, which, under the ruling in *Crandall* v. *Nevada*,\* made them *quoad hoc* unconstitutional and void. The State of Maryland replied, that conceding the statutes to be void for the reason assigned, the company was liable nevertheless, for what it had already collected, and what the passengers, whose rights only were affected, had already paid to it without dispute, and waiving their rights. These propositions of the State were founded, too, on what for thirty years had been established law in its courts;† law which has also the sanction of this court; *Brooks* v. *Martin*,‡ being a leading case on the subject.

Here then was a ground covering the whole case and broad enough to maintain the judgment of the court below, which was presented to that court as a proper basis for its decision, and upon which its judgment was in fact founded. In such a case, according to the judgments of this court, the court will not review.§

Of course, whether a special collector, who has received money for the State, under a law repugnant to the Constitution, but to which he was a willing and interested party, should, on grounds of public policy, be permitted to set up his own wrong, or his participation in the wrong, as an excuse for appropriating the fund, is a question which belongs to the State courts, in cases properly before them.

II. *But assuming that the case is properly here and that the constitutionality of the Maryland statutes is to be passed on.*

The Nevada act imposed, in terms, a capitation tax of

---

\* 6 Wallace, 35.

† Waters v. State, 1 Gill, 308 ; O'Neal v. School Commissioners, 27 Maryland, 240.

‡ 2 Wallace, 70; and see Bell v Railroad Co., 4 Id. 598; Planters' Bank v Union Bank, 16 Id. 500, where the point distinctly arose.

§ Murdock v. City of Memphis, 20 Wallace, 590.

$1.00 upon every individual who left the State by a public conveyance. It was therefore a specific tax upon the traveller, to be paid by and levied on him for the exercise of his right to leave the State by the ordinary public conveyances, and over and above the entire fare for his travel. There is no analogy between such a case and the case at bar.

The Maryland legislation, by its terms, instead of imposing a tax on the traveller, provides only that the company shall semi-annually pay to the State one-fifth of the amount received for " *the transportation of passengers* " or " *passage-money.* " It does not authorize the company to collect a tax from any person, for any privilege, but requires it to pay to the State every six months a tax of one-fifth of the amount received by it for its services in carrying passengers. The " passage-money " received, belongs to the company, to be used and expended as it pleases. After the expiration of each period of six months, and only then, the amount of the tax is to be ascertained and the State becomes entitled to demand and receive that amount. This is simply a tax on its gross receipts from passenger fare, and the amount of the tax is to be ascertained every six months by the amount of its business during that period in passenger transportation.*

Again, the Nevada law prohibited the citizen from travelling at the usual and agreed rates of fare, over existing and established routes, and in existing and established conveyances. It impaired and obstructed his existing rights. The Maryland statutes were passed in order to create new and improved modes of conveyance; to give to the traveller a railroad instead of a turnpike.

Further. The right to one-fifth of the amount of the gross receipts from passenger fare was given to the State as a *bonus* for the franchise and as the price of a valuable privilege and option which it parted with on the company's urgency, and which the State might have refused, on any terms if it had seen fit. A State may exact from a company which it charters, as a *bonus*, or price for the franchise which

---

* Society for Savings *v.* Coite, 6 Wallace, 608.

it grants, and the privileges which it relinquishes, a sum of money payable in cash, or by instalments, or at some distant day, with interest payable semi-annually.* How does the *bonus* become unconstitutional because its amount is to be ascertained semi-annually, according to the gross receipts from the transportation of passengers? Like the *bonus* just referred to, it is exacted from the company—to be paid by it out of its receipts—and cannot be increased by the State to the point of prohibition, because its amount is proportionally fixed by a contract which the Constitution protects. The mere fact that this amount is measured by the semi-annual receipts from passenger travel cannot convert it into a capitation tax on passengers; and except in that fact it does not differ from the *bonus* supposed.

The constitutionality of such a tax as was here laid is established by this court in the case of " *State Tax on Railway Gross Receipts.*"†

*Reply:*

I. *As to the jurisdiction.*

Was there, below, any question of Federal law of such controlling character that a correct decision of it is necessary to any final judgment in the case? If there was, of course there is a right of review. We say that there was such a question.

The action being one of *indebitatus assumpsit*, and the counts general, the declaration did not indeed, of itself, show such a question. But when a bill of particulars was asked for and given, the bill given made the declaration equivalent to a special declaration in assumpsit on a contract between the company and the State. Hence the State offered in evidence the statutes of the State giving the alleged right to the one-fifth. The State, therefore, made the statute giving one-fifth, and the stipulation under the statute, an integral part of its case. The case could not stand, possibly, independently of the statute, and if the

---

* Gordon *v.* Appeal Tax Court, 3 Howard, 145.     † 15 Wallace, 284.

company set up that the statute of the State was void as opposing the Federal Constitution—which by its request to charge it did set up—and a judgment was entered against the company, then jurisdiction here arises within section 709 of the Revised Statutes; the old twenty-fifth section of the Judiciary Act.

The vice of the opinion of the Court of Appeals is that it divides into two parts a contract whose parts are necessarily inseparable. The collection it makes one part, the paying over another part. The charter gave the right to collect within the maximum of $2.50. No constitutional question could arise there. The collection for the purpose of paying over and the actual paying over constituted the illegal act, under a contract not to collect only, but to collect *and* pay over: necessarily, we repeat, an entirety.

Before the State can establish a right to any part of the revenue from the road it must exhibit the unconstitutional act as the foundation of its claim. Put the case in the form of a dialogue:

"You have moneys which belong to me," says the State.

"We deny it," replies the company.

"Have you not received $1.50 a head for so many passengers between Baltimore and Washington?" asks the State.

"We have," say the company, "but what right have you to any part of it?"

"A statute of Maryland gives me the right," says the State.

The company answers: "That act being unconstitutional can confer no right. *But for the act the whole fare would belong to us. It falls within the limit that we are authorized to charge per passenger.* You can claim no part of it unless you first produce the act; and when that is produced its unconstitutionality defeats your claim."

This answer is conclusive. Jurisdiction, then, exists.

II. *As to the constitutionality of the tax.*

The tax is said to be a *bonus*, and therefore valid.

As a *bonus* is ordinarily understood, it is a payment by the stockholders in a corporation for corporate privileges. If

paid at once it affects their capital; if paid annually it affects their income. But here neither the capital nor the income is affected. The capital is not affected because the payment is an annual one. The income is not affected because this annual payment does not belong to the company, but is received by it, accounted for by it, and paid into the State treasury. Affecting, then, neither the capital nor the income of the stockholders, it comes within no known definition of a *bonus*. It is a tax, and nothing but a tax; a capitation tax, in the recognized meaning of the term.

Mr. Justice BRADLEY delivered the opinion of the court

The first question raised has reference to jurisdiction.

It appears by the record that the question of the constitutionality of the stipulation, under the statute of Maryland, was distinctly raised by the defendant, with a denial of any estoppel precluding such a defence. The counsel for the plaintiff contend, and the Court of Appeals of Maryland held, that whether the stipulation by the State for one-fifth of the passage-money was constitutional or not, it was received by the company for the State, and was the money of the State, the company being merely the agent of the State to collect it; and that the company was, therefore, bound to respond to the State for it, on the ground that an agent or receiver cannot withhold the money of his principal under pretence of illegality in the transaction by virtue of which it was obtained. The general doctrine referred to is a sound one, and if it were applicable to this case it would follow that the constitutional question was not necessarily involved; but as this question was in fact passed upon by the Court of Appeals, and ruled against the defendants, though not the principal ground on which it placed its judgment, it would be our duty, under our recent rulings on the construction of the act of 1867, to assume jurisdiction of the case, and review the judgment of the State court on the constitutional point. But with great respect for the opinion of that learned court, we are compelled to differ with it as to the applicability to the present case of the doctrine referred to. We

cannot concur in the position that any part of the passenger-money, when received by the company, became or was the money of the State. It was the money of the railroad company alone. The railroad company was authorized by its charter to charge the passenger for transporting him between Baltimore and Washington what it did charge him. The State cannot be permitted to deny that it had power to confer upon the company such a franchise; nor can it be permitted to say that the passenger could complain of any extortion practiced upon him; for the fare, so far as he was concerned, was perfectly legitimate. It might have been greater than it was, and yet he would have had no right to complain. The State, at least, is estopped from saying that he could justly do so. The company, then, charged a lawful fare. The money all went into its treasury together, and one portion was not distinguished from another. The company was simply under a contract to pay to the State one-fifth of the whole amount received for the transportation of passengers. If there was anything unconstitutional in the arrangement it was this contract. The grant of the right to build the road and operate it was constitutional; the right to charge fare and freight was constitutional; the amount of such fare and freight would have been entirely in the discretion of the company if it had not been limited by the grant. There is, in short, nothing in the whole transaction between the State and the company to which, in a constitutional point of view, the slightest exception can be taken, except this contract to pay to the State a portion of the amount received. In the cases in which it has been held that parties engaged in an illegal undertaking are answerable to one another for moneys received therein, it was the undertaking, and not the agreement to pay over the moneys received, which was obnoxious to the law or its policy. In this case it is not the transaction out of which the money grew, but the agreement to pay over a portion of it, which is vicious, if anything is vicious; and the transaction is only vicious, if at all, because of the reflected effect of the agreement upon it. We think no case can be found where the

agreement itself, to divide a common fund or to pay over money received, as contradistinguished from the transaction out of which the money arose, was illegal, in which it has been held that a recovery could be had. If it be said that the vice, if any, lies back of the agreement, namely, in the reservation by the State of one-fifth, it would amount to the same thing. The right to recover would then stand on the reservation, and would be no better than before.

We think, therefore, that the constitutionality of the stipulation came directly in question, and could not properly be avoided in determining the case.

In approaching the merits of the case it is unnecessary to examine in detail the various laws which constitute the charter of the railroad company in reference to the construction of the Washington branch. They were all accepted by the company, and no question of impairing the obligation of contracts is raised. The substance is simply this: That the State granted to the railroad company the franchise of constructing a railroad from Baltimore to Washington, and of employing machinery and vehicles thereon for the transportation of passengers and merchandise, and of charging therefor certain rates of fare for the one, and freight for the other, the passenger fare not to exceed two dollars and fifty cents per passenger for the entire distance, and in that proportion for less distances; and it was stipulated that the company should, at the end of every six months, pay to the State one-fifth of the whole amount which might be received for the transportation of passengers. The question is, whether such a stipulation is, or is not, a violation of the Constitution of the United States, as being a restriction of free intercourse and traffic between the different States.

That the road is one of the principal thoroughfares in the country for interstate travel is conceded, and, indeed, may be judicially assumed. As, however, nearly all the railroads in the country are, or may be, used to a greater or less extent as links in through transportation, this road cannot in principle be regarded as an exceptional one in that respect.

Commerce on land between the different States is so strikingly dissimilar, in many respects, from commerce on water, that it is often difficult to regard them in the same aspect in reference to the respective constitutional powers and duties of the State and Federal governments. No doubt commerce by water was principally in the minds of those who framed and adopted the Constitution, although both its language and spirit embrace commerce by land as well. Maritime transportation requires no artificial roadway. Nature has prepared to hand that portion of the instrumentality employed. The navigable waters of the earth are recognized public highways of trade and intercourse. No franchise is needed to enable the navigator to use them. Again, the vehicles of commerce by water being instruments of intercommunication with other nations, the regulation of them is assumed by the National legislature. So that State interference with transportation by water, and especially by sea, is at once clearly marked and distinctly discernible. But it is different with transportation by land. This, when the Constitution was adopted, was entirely performed on common roads, and in vehicles drawn by animal power. No one at that day imagined that the roads and bridges of the country (except when the latter crossed navigable streams) were not entirely subject, both as to their construction, repair, and management, to State regulation and control. They were all made either by the States or under their authority. The power of the State to impose or authorize such tolls, as it saw fit, was unquestioned. No one then supposed that the wagons of the country, which were the vehicles of this commerce, or the horses by which they were drawn, were subject to National regulation. The movement of persons and merchandise, so long as it was as free to one person as to another, to the citizens of other States as to the citizens of the State in which it was performed, was not regarded as unconstitutionally restricted and trammelled by tolls exacted on bridges or turnpikes, whether belonging to the State or to private persons. And when, in process of time, canals were constructed, no amount

of tolls which was exacted thereon by the State or the companies that owned them, was ever regarded as an infringement of the Constitution.   When constructed by the State itself, they might be the source of revenues largely exceeding the outlay without exciting even the question of constitutionality.   So when, by the improvements and discoveries of mechanical science, railroads came to be built and furnished with all the apparatus of rapid and all-absorbing transportation, no one imagined that the State, if itself owner of the work, might not exact any amount whatever of toll or fare or freight, or authorize its citizens or corporations, if owners, to do the same.   Had the State built the road in question it might, to this day, unchallenged and unchallengeable, have charged two dollars and fifty cents for carrying a passenger between Baltimore and Washington.   So might the railroad company, under authority from the State, if it saw fit to do so.   These are positions which must be conceded.   No one has ever doubted them.

This unlimited right of the State to charge, or to authorize others to charge, toll, freight, or fare for transportation on its roads, canals, and railroads, arises from the simple fact that they are its own works, or constructed under its authority.   It gives them being.   It has a right to exact compensation for their use.   It has a discretion as to the amount of that compensation.   That discretion is a legislative—a sovereign—discretion, and in its very nature is unrestricted and uncontrolled.   The security of the public against any abuse of this discretion resides in the responsibility to the public of those who, for the time being, are officially invested with it.   In this respect it is like all other legislative power when not controlled by specific constitutional provisions, and the courts cannot presume that it will be exercised detrimentally.

So long, therefore, as it is conceded (as it seems to us it must be) that the power to charge for transportation, and the amount of the charge, are absolutely within the control of the State, how can it matter what is done with the money, whether it goes to the State or to the stockholders of a pri-

vate corporation? As before said, the State could have built the road itself and charged any rate it chose, and could thus have filled the coffers of its treasury without being questioned therefor. How does the case differ, in a constitutional point of view, when it authorizes its private citizens to build the road and reserves for its own use a portion of the earnings? We are unable to see any distinction between the two cases. In our judgment there is no solid distinction. If the State, as a consideration of the franchise, had stipulated that it should have all the passenger-money, and that the corporation should have only the freight for the transportation of. merchandise, and the corporation had agreed to those terms, it would have been the same thing. It is simply the exercise by the State of absolute control over its own property and prerogatives.

The exercise of power on the part of a State is very different from the imposition of a tax or duty upon the movements or operations of commerce between the States. Such an imposition, whether relating to persons or goods, we have decided the States cannot make, because it would be a regulation of commerce between the States in a matter in which uniformity is essential to the rights of all, and, therefore, requiring the exclusive legislation of Congress.* It is a tax because of the transportation, and is, therefore, virtually a tax on the transportation, and not in any sense a compensation therefor, or for the franchises enjoyed by the corporation that performs it.

It is often difficult to draw the line between the power of the State and the prohibitions of the Constitution. Whilst it is commonly said that the State has absolute control over the corporations of its own creation, and may impose upon them such conditions as it pleases; and like control over its own territory, highways, and bridges, and may impose such exactions for their use as it sees fit; on the other hand, it is conceded that it cannot regulate or impede interstate commerce, nor discriminate between its own citizens and

---

* Crandall v. Nevada, 6 Wallace, 42; Case of Freight Tax, 16 Id. 232, 279.

those of other States prejudicially to the latter.   The problem is to reconcile the two propositions; and as the latter arises from the provisions of the Constitution of the United States, and is, therefore, paramount, the question is practically reduced to this:   What amounts to a regulation of commerce between the States, or to a discrimination against the citizens of other States?   This is often difficult to determine.   In view, however, of the very plenary powers which a State has always been conceded to have over its own territory, its highways, its franchises, and its corporations, we cannot regard the stipulation in question as amounting to either of these unconstitutional acts.   It is not within the category of such acts.   It may, incidentally, affect transportation, it is true; but so does every burden or tax imposed on corporations or persons engaged in that business.   Such burdens, however, are imposed *diverso intuitû*, and in the exercise of an undoubted power.   The State is conceded to possess the power to tax its corporations; and yet every tax imposed on a carrier corporation affects more or less the charges it is compelled to make upon its customers.   So, the State has an undoubted power to exact a bonus for the grant of a franchise, payable in advance or *in futuro;* and yet that bonus will necessarily affect the charge upon the public which the donee of the franchise will be obliged to impose.   The stipulated payment in this case, indeed, is nothing more nor less than a bonus; and so long as the rates of transportation are entirely discretionary with the States, such a stipulation is clearly within their reserved powers.

Of course, the question will be asked, and pertinently asked, Has the public no remedy against exorbitant fares and freights exacted by State lines of transportation?   We cannot entirely shut our eyes to the argument *ab inconvenienti.*   But it may also be asked, has the public any remedy against exorbitant fares and freights exacted by steamship lines at sea?   Maritime transportation is almost as exclusively monopolized by them as land transportation is by the railroads.   In their case the only relief found is in the ex-

istence or fear of competition. The same kind of relief should avail in reference to land transportation.

Whether, in addition to this, Congress, under the power to establish postroads, to regulate commerce with foreign nations, and among the several States, and to provide for the common defence and general welfare, has authority to establish and facilitate the means of communication between the different parts of the country, and thus to counteract the apprehended impediments referred to, is a question which has exercised the profoundest minds of the country. This power was formerly exercised in the construction of the Cumberland road and other similar works. It has more recently been exercised, though mostly on National territory, in the establishment of railroad communication with the Pacific coast. But it is to be hoped that no occasion will ever arise to call for any general exercise of such a power, if it exists. It can hardly be supposed that individual States, as far as they have reserved, or still possess, the power to interfere, will be so regardless of their own interest as to allow an obstructive policy to prevail. If, however, State institutions should so combine or become so consolidated and powerful as, under cover of irrevocable franchises already granted, to acquire absolute control over the transportation of the country, and should exercise it injuriously to the public interest, every constitutional power of Congress would undoubtedly be invoked for relief. Some of the States are so situated as to put it in their power, or that of their transportation lines, to interpose formidable obstacles to the free movement of the commerce of the country. Should any such system of exactions be established in these States, as materially to impede the passage of produce, merchandise, or travel, from one part of the country to another, it is hardly to be supposed that the case is a *casus omissus* in the Constitution. Commercially, this is but one country, and intercourse between all its parts should be as free as due compensation to the carrier interest will allow. This is demanded by the "general welfare," and is dictated by the spirit of the Constitution at least.

Statement of the case.

Any local interference with it will demand from the National legislature the exercise of all the just powers with which it is clothed.

But whether the power to afford relief from onerous exactions for transportation does, or does not, exist in the General government, we are bound to sustain the constitutional powers and prerogatives of the States, as well as those of the United States, whenever they are brought before us for adjudication, no matter what may be the consequences. And, in the case before us, we are of opinion that these powers have not been transcended.

JUDGMENT AFFIRMED.

Mr. Justice MILLER, dissenting:

I am of opinion that the statute of Maryland requiring the railroad company to pay into the treasury of the State one-fifth of the amount received by it from passengers on the branch of the road between Baltimore and Washington, confined as it is exclusively to passengers on that branch of the road, was intended to raise a revenue for the State from all persons coming to Washington by rail, and had that effect for twenty-five years, and that the statute is, therefore, void within the principle laid down by this court in *Crandall* v. *Nevada.**