## TRUSLER *v.* CROOKS, AS COLLECTOR AND INDIVIDUALLY.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR
THE WESTERN DISTRICT OF MISSOURI.

No. 188. Argued November 17, 1925.—Decided January 11, 1926.

Section 3 of the " Future Trading Act," purporting to impose a tax of 20 cents per bushel upon all privileges or options for contracts of purchase or sale of grain, known to the trade as 'privileges,' 'bids,' 'offers,' 'puts and calls,' 'indemnities,' or 'ups and downs,' is unconstitutional. Its purpose is not to raise revenue but to inhibit, by a penalty, the transactions referred to, as part of the plan set up by the Act for regulating grain exchanges under guise of the federal taxing power, which was adjudged unconstitutional in *Hill* v. *Wallace*, 259 U. S. 44. P. 479.

300 Fed. 996, reversed.

ERROR to a judgment of the District Court for the defendant in an action brought to recover money paid under protest as a stamp tax.

*Mr. E. R. Morrison* for plaintiff in error.

The contracts referred to in § 3 do not constitute interstate commerce, and this is shown both from the agreed statement of facts and from the previous decisions of this Court dealing with subjects related to future trading in grain and cotton.

This section is not a taxing act, but is a regulation of intrastate commerce.

(A) This is shown from the title of the act as a whole, which recites that it is for the regulation of boards of trade.

(B) The report of the Committee on Agriculture in submitting this bill to the House, states that it will absolutely wipe out of existence these contracts, and this Court can resort to these congressional records to determine the purpose of this section.

(C) The exhorbitant character of the tax, considered in connection with the other evidences of the purpose of Congress, clearly shows the purpose was to destroy and not to tax, and that the section imposes nothing but a penalty.

(D) Aside from all other questions in the case, the fact alone that the purported tax amounts to 200 times the value of the contract which is the subject of the tax, in and of itself is sufficient to indicate that the purpose of Congress in enacting this section was to destroy contracts of this character, and to show that this section has no real relation to the taxing power of the Federal Government.

(E) Section 11 of the act, which provides that any provision shall be held valid, nothwithstanding any other provisions are held invalid, cannot change or alter the purpose of this section, inasmuch as the question to be determined here is not whether the section should be considered as complete when standing alone, but whether it was passed with the purpose of prohibiting the making of these contracts.

*Solicitor General Mitchell* and *Mr. Robert P. Reeder,* Special Assistant to the Attorney General, were on the brief, for the defendant in error.

While this Court has decided that § 4 and interwoven regulations of the Future Trading Act are unconstitutional, it has expressly said that that decision does not apply to the section involved in the present case. In *Hill* v. *Wallace,* 259 U. S. 44, the Court was able to see on the face of the act a purpose to enact by means of a tax law detailed regulation of business activities which were not within the control of Congress. *Child Labor Tax Case,* 259 U. S. 20. The act contains a saving clause which furnishes assurance that courts may properly sustain separate portions of the act even though other portions should be shown to be invalid.

The tax imposed in § 3 was imposed absolutely upon all transactions of a designated character. As the Court said, it does not seem to be associated with the tax which § 4 imposed conditionally upon sales by those who were neither owners of grain nor similarly situated. The condition was compliance with an elaborate system of regulations. It was the effort to enforce those regulations through the alternative of a heavy tax which rendered the tax unconstitutional. The tax imposed in § 3 is not tied up with any collateral regulations whatever. The reasons which led the Court to declare other portions of the act unconstitutional do not apply to § 3.

There is nothing in the Future Trading Act which shows that Congress enacted § 3 for any other purpose than to raise revenue. But even if it were clearly established that Congress intended that the tax should be destructive, that fact would not render the tax unconstitutional. It is clear that Congress did not enact § 3, as it did § 4, as a step in the detailed regulation of business activities which are not within the control of Congress. So far as appears in the act the tax imposed

in § 3 is just such a tax as this Court has sustained repeatedly. It appears to be of the same nature as the taxes on sales at exchanges or boards of trade which were sustained in *Nichol* v. *Ames,* 173 U. S. 509, and in *Thomas* v. *United States,* 192 U. S. 363, and on agreements to sell shares of stock, otherwise known as "calls," which were sustained in *Treat* v. *White,* 181 U. S. 264. Where there is a lawful power to impose a tax its imposition may not be treated as without the power because of the destructive effect of the exertion of the authority. *Austin* v. *The Aldermen,* 7 Wall. 694; *McCray* v. *United States,* 195 U. S. 56; *Knowlton* v. *Moore,* 178 U. S. 41; *License Tax Cases,* 5 Wall. 462; *Pacific Insurance Co.* v. *Soule,* 7 Wall. 433; *Veazie Bank* v. *Fenno,* 8 Wall. 533; *Spencer* v. *Merchant,* 125 U. S. 345; *Treat* v. *White,* 181 U. S. 264; *Patton* v. *Brady,* 184 U. S. 608; *United States* v. *Doremus,* 249 U. S. 86; *Alaska Fish Co.* v. *Smith,* 255 U. S. 44.

If Congress has power to regulate directly it has power to regulate through the imposition of a tax, not merely by a tax which regulates incidentally but by a tax which is unquestionably imposed primarily for the purpose of regulating. This case does not involve the question whether a tax imposed with that end clearly in view may be enforced in any other way than that which is usual in the collection of taxes. Protective tariffs are, however, enforced in precisely the same manner as a tariff for revenue only would be made effective.

It seems appropriate for the law officers of the United States, without regard to individual conviction, to submit the case for the usual consideration by the Court, and, since the arguments against the validity of the statute are adequately presented by the plaintiff in error, to file a brief in support of the statute. Our duty to sustain and enforce the acts of Congress does not outweigh the obligation to support and defend the Constitution, and

we feel under no obligation to conceal our opinion that in this case Congress under the guise of a revenue measure which can not produce a dollar of revenue (except that paid to make a test case) has attempted to completely prohibit transactions which it has no power under the Constitution to deal with.

MR. JUSTICE MCREYNOLDS delivered the opinion of the Court.

Plaintiff in error seeks to recover two hundred dollars paid for internal revenue stamps which, after due protest, he affixed to a written " privilege or option for a contract for the sale of grain in the form commonly known as an indemnity," as required by § 3, " The Future Trading Act," approved August 24, 1921, c. 86, 42 Stat. 187. If, as he insists, that section is beyond congressional power and therefore invalid, he must prevail; otherwise the judgment below must be affirmed.

That statute is entitled "An Act Taxing contracts for the sale of grain for future delivery, and options for such contracts, and providing for the regulation of boards of trade, and for other purposes."

Section 2 declares that the term " ' contract of sale ' shall be held to include sales, agreements of sale, and agreements to sell; " the word " ' grain ' shall   .   .   . mean wheat, corn, oats, barley, rye, flax, and sorghum; " the words " ' board of trade ' shall be held to include and mean any exchange or association, whether incorporated or unincorporated, of persons who shall be engaged in the business of buying or selling grain or receiving the same for sale on consignment."

Section 3. " That in addition to the taxes now imposed by law there is hereby levied a tax amounting to 20 cents per bushel on each bushel involved therein, whether the actual commodity is intended to be delivered or only nominally referred to, upon each and every privilege or

option for a contract either of purchase or sale of grain, intending hereby to tax only the transactions known to the trade as 'privileges,' 'bids,' 'offers,' 'puts and calls,' 'indemnities,' or 'ups and downs.'"

Sections 4 to 10 impose a charge of 20 cents per bushel upon all grain involved in sale contracts for future delivery, with two exceptions. But, as declared by *Hill* v. *Wallace,* 259 U. S. 44, 66, their real purpose was to regulate "the conduct of business of boards of trade through supervision of the Secretary of Agriculture and the use of an administrative tribunal consisting of that Secretary, the Secretary of Commerce, and the Attorney General."

Section 11. "That if any provision of this Act or the application thereof to any person or circumstances is held invalid, the validity of the remainder of the Act and of the application of such provision to other persons and circumstances shall not be affected thereby."

Sections 4 to 10 were challenged in *Hill* v. *Wallace,* decided upon demurrer to the bill, and we held: "The act is in essence and on its face a complete regulation of boards of trade, with a penalty of 20 cents a bushel on all 'futures' to coerce boards of trade and their members into compliance. When this purpose is declared in the title to the bill, and is so clear from the effect of the provisions of the bill itself, it leaves no ground upon which the provisions we have been considering can be sustained as a valid exercise of the taxing power."

We there said: "There are sections of the act to which under § 11 the reasons for our conclusion as to § 4 and the interwoven regulations do not apply. . . . Section 3, too, would not seem to be affected by our conclusion. . . . This is the imposition of an excise tax upon certain transactions of a unilateral character in grain markets which approximate gambling or offer full opportunity for it and does not seem to be associated with § 4. Such a tax without more would seem to be within the

# TRUSLER *v.* CROOKS. 481

congressional power. . . . But these are questions which are not before us and upon which we wish to express no definite opinion." Of course, the quoted statement concerning § 3 was intended to preclude any possible inference that we had passed upon a matter not directly in issue and to indicate that it remained open for discussion.

The present cause was tried upon an agreed statement of facts and it appears—

That at Emporia, Kans., October 23, 1923, plaintiff in error, a member of the Chicago Board of Trade, in consideration of one dollar, signed and delivered the following privilege or option, in the form commonly known as an "indemnity," addressed to R. F. Teichgraeber, for a contract for the sale of grain: "I will sell one thousand bushels of contract grade wheat at $1.11¼ per bushel, for delivery during May, 1924, same to be delivered in regular warehouses under the rules of the Board of Trade of the City of Chicago. This offer is made subject to acceptance by you until the closing hour for regular trading on October 24, 1923." The transaction was one of those described by § 3 as "privileges, bids, offers, puts and calls, indemnities, or ups and downs."

After duly advising the Collector that he denied validity of the tax, plaintiff in error affixed to this written instrument two hundred dollars of internal revenue stamps.

For many years prior to August 24, 1921, members of grain exchanges bought and sold in large quantities agreements for contracts for purchase or sale of grain subject to acceptance within a definite time thereafter, commonly known as "indemnities." When the holder of one of these elected to exercise his rights the specified amount of grain was bought or sold on the exchange indicated for future delivery, and the agreement was thus finally consummated.

By far the larger percentage of such agreements were subject to acceptance during the following day at a price

ordinarily within one-fourth to three-fourths of a cent of the price prevailing when the market closed on day of the agreement. During many years the uniform consideration paid was one dollar per thousand bushels.

When the holder elected to exercise the option the transaction could be carried out only through and by members of exchanges open to sales for future delivery.

The stipulated facts reveal the cost, terms and use of " indemnity." contracts together with their relation to boards of trade and indicate quite plainly that § 3 was not intended to produce revenue but to prohibit all such contracts as part of the prescribed regulatory plan. The major part of this plan was condemned in *Hill* v. *Wallace,* and § 3, being a mere feature without separate purpose, must share the invalidity of the whole. *Wolff Packing Co.* v. *Industrial Court,* 267 U. S. 552,.569.

This conclusion seems inevitable when consideration is given to the title of the Act, the price usually paid for such options, the size of the prescribed tax (20 cents per bushel), the practical inhibition of all transactions within the terms of § 3, the consequent impossibility of raising any revenue thereby, and the intimate relation of that section to the unlawful scheme for regulation under guise of taxation. The imposition is a penalty, and in no proper sense a tax. *Child Labor Tax Case,* 259 U. S. 20; *Lipke* v. *Lederer,* 259 U. S. 557, 561; *Linder* v. *United States,* 268 U. S. 5.

The judgment of the court below must be reversed and the cause remanded for further proceedings in conformity with this opinion.

*Reversed.*