## P. E. HARRIS & CO. v. MULLANEY et al.
### No. 6105–A.

United States District Court, Alaska First Division, Juneau.

Oct. 3, 1949.

W. C. Arnold, Seattle, Washington, Bogle, Bogle & Gates, Seattle, Washington, Faulkner, Banfield & Boochever, Juneau, Alaska, for plaintiff.

Edward W. Allen, Seattle, Washington, R. E. Robertson, Juneau, Alaska, W. C. Arnold, Seattle, Wash., for intervenor.

J. Gerald Williams, Territorial Atty. Gen., John H. Dimond, Asst. Atty. Gen., for defendant.

FOLTA, District Judge.

Plaintiff and intervenors seek to enjoin the enforcement of Chapter 11, Session Laws of Alaska 1949, amending paragraph

(h) of subsection 7 of Section 35-1-11, A.C. L.A.1949, by increasing the tax on salmon traps 400% and on the first 100,000 salmon taken from any one trap from no tax at all to $6,750, and thereafter progressively increasing the tax so that on 250,000 salmon taken from any one trap the increase is from $600 to $43,500 or 72½ times the previous rate. Plaintiff's Exhibit 5. The former rate was $4 on each thousand fish in excess of 100,000 taken from any one trap.

The case is now before me on the merits.

The basic tax on a fish trap whether of the pile or floating type (the only kinds here involved) is $1,200 as against $10 for a seine, its nearest competitor, and $2 for a gill net. Since no tax is imposed on fish caught with a seine or gill net, it costs the trap operator in taxes on 100,000 fish 675 times, or on 250,000, 4,350 times as much as the seine operator is required to pay.

Plaintiff and intervenors contend that the act is void because:

(1) It imposes an undue burden on interstate commerce in violation of the commerce clause of the Constitution, art. 1, § 8, cl. 3;

(2) It unreasonably and arbitrarily discriminates between fixed-type fishing gear, and mobile gear, and also between trap operators by imposing a flat tax without regard to wide variations in species, size and value of the fish, in violation of the Fifth and Fourteenth Amendments to the Constitution, Section 9 of the Organic Act, 37 Stat. 512, 48 U.S.C.A. §§ 77, 78, and the Civil Rights Act, 8 U.S.C.A. § 41;

(3) The taxing power is used to accomplish a forbidden end—the prohibition of the use of fish traps—in violation of Section 1 of the White Act, 44 Stat. 752, 48 U.S.C.A. § 222; Section 3 of the Organic Act, 37 Stat. 512, 48 U.S.C.A. §§ 23, 24;

(4) It was made retroactive to January 1, 1949, without providing for a refund of the license fees already paid, thus depriving licensees, confronted with such confiscatory taxation, of the right to withdraw without forfeiting the fees paid.

Defendant contends that the tax, with its gradations, is merely a revenue measure based on ability to pay.

It is obvious, therefore, that there is more to this litigation than meets the eye, and that legislative intent assumes a place of paramount importance in the solution of the questions presented.

Plaintiff operates 3 salmon canneries, and 26 pile and floating traps in connection therewith, in Southeastern and Western Alaska. It has been in this business 40 years. Intervenors have operated 3 traps since 1942.

Except for one end of the mooring cable, which is made fast to the shore or upland, the entire trap structure is erected on or over tide or submerged land and extends to the seaward, usually at right angles to the shore, terminating in the trap proper beyond the line of ordinary law water, where it intercepts the run of salmon on their way to the spawning grounds. Approximately 40% of the catch of salmon is made by traps, 35% by seines and 25% by gill nets. The entire pack of salmon, except for negligible portion sold locally, is marketed in the States and foreign countries. During the period 1943–1947 the number of seines employed in the salmon fisheries of Alaska was 869, the average take of which was slightly more than 30,000 salmon per seine, plaintiff's exhibit 6, as against 405 traps which caught an average of less than 80,000 each (plaintiff's exhibit 8) upon which the tax, computed at the present rates, would be 1/400 of a cent and 7.43¢ respectively, or 3,000 times greater on 80,000 fish caught in a trap than if taken in a seine (plaintiff's exhibit 5). Manifestly a tax on the fish caught in a trap is a tax on the trap itself. Cf. Fairbank v. United States, 181 U.S. 283, 21 S.Ct. 648, 45 L.Ed. 862.

Before the enactment of Chapter 11, plaintiff and intervenors paid the territorial license fees and obtained licenses to operate their traps after which the Territory demanded, under the retroactive provision, the payment of the additional fees exacted by the Act.

250

■ It is conceded that the Territory has no power to regulate the fisheries, that power being lodged in Congress.

In support of their contention that the tax is confiscatory and so excessive that it is prohibitory and, therefore, regulatory, plaintiff and intervenors have introduced many documentary exhibits, prepared by certified public accountants, which show that the application of the present taxes to their operations for the past 7 or 8 years would have resulted in substantial losses. Intervenors' Exhibit 1; Exhibits C and D of plaintiff's exhibit 1; Plaintiff's Exhibit 2, 3 and 13. These figures, however, are merely illustrative because income was not computed at current fish prices. As against that showing defendant's exhibits C and D indicate that the increase in the tax computed on the salmon caught in traps in 1948 would amount to but slightly more then 1,000% for the entire industry and approximately the same on the salmon caught in the traps of plaintiff and intervenors.

Since the run of salmon fluctuates from year to year and between the several districts into which the Territory has been divided by the Secretary of the Interior for administrative purposes, there is a corresponding fluctuation in income from year to year and district to district. Moreover, since the entire salmon pack is never sold in the year in which packed, it is impossible to obtain an accurate picture of the industry from data complied on the basis of any one year's operations, and, hence, plaintiff's and intervenors' evidence covers the period 1941 to the time of the trial. Thus plaintiff's exhibits 1 and 2 show the number of fish taken in plaintiff's and intervenors' traps during that period, their cost and market value, and the losses that would have been sustained had the taxes imposed under Chapter 11 been in effect. On the other hand, the defendant points out in his brief that different methods of computation and bookkeeping and the application of 1948 prices to the catch of at least some of the earlier years embraced within the 1941–1948 period, would convert the losses claimed into profit.

It may not be amiss at this point to note briefly the differences between a trap and a seine and the methods employed in their operation.

A trap is a massive structure which is erected in navigable waters under a permit issued only upon a determination by the War Department that it will not interfere with navigation. Once a pile trap is constructed or a floating trap is anchored on the site for which the permit has been issued, it remains in place and is kept in a fishing condition for the duration of the fishing season, except that it must be closed during the weekly closed period of 36 hours fixed by federal law. 48 U.S.C.A. § 234. It is so placed as to intercept any run of salmon along or near the shore. A crew of 2 keeps the trap in fishing condition, except during the closed periods mentioned. When sufficient fish are caught, the trap is brailed by a brailing crew aboard a tender assigned to the job of transporting the catch from the trap to the cannery.

The expense of placing a pile or floating trap in a fishing condition before the opening of the season each year is fixed in the sense that it bears no relation to the catch expected or realized, and must in any event be incurred if the trap is to fish. Indeed, this cost may be said to be the only constant in an equation of variables. But once the value of the catch equals this cost, the ratio of profit to operating expenses increases progressively.

A seine costs much less than a trap, but since it is not self-operating, it requires a boat and a crew of 5 or 6 to fish with it and, hence, the initial outlay is perhaps as great on the average as in the case of the trap. Unlike the trap, however, which is stationary, the seine boat goes from place to place, according to report or rumor of the presence of fish, and although the cost of putting it into fishing condition each year is likewise irreducible, regardless of whether preparations are made for a large or small catch, its operating expenses continue and are in direct relation to the time and effort expended in fishing operations. In other words, after this fixed pre-season expense has been met and the only other expense which must be met is the cost of actual fishing operations, the cost of each successive haul thereafter does not dimin-

ish, and there is no progressive increase in income as in the case of the trap. Moreover, while the trap remains in a fishing condition night and day, fishing operations with a seine are limited to the hours of daylight. This might account to some extent for an average catch of 80,000 by a trap as against 30,000 by a seine.

For further information in regard to these types of gear, see the report of the Committee on Interstate and Foreign Commerce on S. 1446, a bill to authorize the leasing of salmon trap sites in Alaskan waters, 80th Congress, 2d session. Plaintiff's exhibit 10.

I am of the opinion that the contention that the tax is so excessive as to infringe on the right to fish on the basis of equality guaranteed by the White Act must be sustained, and, hence, the remaining contentions will not be discussed.

It is conceded that the Territory has no power to regulate the fisheries. Section 3 of the Organic Act of August 24, 1912, 37 Stat. 512, 48 U.S.C.A. § 24, provides that: "The authority granted to the legislature by section 23 of this title to alter, amend, modify, and repeal laws in force in Alaska shall not extend to the customs, internal revenue, postal, or other general laws of the United States or to the game, fish, and fur seal laws and laws relating to fur-bearing animals of the United States applicable to Alaska, or to the laws of the United States providing for taxes on business and trade, or to sections 41, 47, 161 to 169, 321 to 325, and 329 of this chapter. This provision shall not operate to prevent the legislature from imposing other and additional taxes or licenses."

Section 1 of the White Act of June 6, 1924, 43 Stat. 465, as amended, 48 U.S.C.A. § 222, making comprehensive provision for the regulation of the fisheries of Alaska, provides that: "No exclusive right of fishery shall be granted therein, * * * *nor shall any citizen of the United States be denied the* right to take, prepare, cure, or preserve *fish* or shellfish *in any area of the waters of Alaska where fishing is permitted by the Secretary of Commerce."* (Emphasis supplied.)

The question presented, therefore, is whether the tax is so excessive as to constitute a denial or impairment of this right by prohibiting or interfering with the use of a device expressly permitted by Congress. In their brief, plaintiff and intervenors put their case in the following language: "Here is a food production occupation, hence of the highest type of legitimacy, conducted in a manner expressly authorized by Federal regulation, as to which the Federal Government has the exclusive right of regulation, which the Territory, with absolutely no right to regulate, proposes deliberately to destroy by a tax so high that there can be no rational hypothesis for its enactment other than an intention to destroy. This case presents the issue of whether the sham of taxation may successfully conceal the substance of deliberate destruction or whether a court will penetrate the camouflage."

The Court is then asked to take judicial notice of the fact that in the 1948 election, at which were elected the members of the Legislature which enacted Chapter 11, there was a referendum pursuant to Chapter 2, S.L.A. 1947, on a matter wholly beyond the power of the Territorial Legislature, upon which the vote showed that the electors favored the abolition of fish traps by a large majority. The enactment of Chapter 11, on the heels of the referendum vote is pointed to as proof of the charge that the Legislature, under the guise of exerting the tax power, in reality usurped the power of regulation reserved by Congress, in an attempt to abolish fish traps. Further support for this charge is predicated on the excessiveness of the tax, the fact that it bears no relation to the value of the fish, the rate for the highest bracket being in excess of the current market value of the fish, that it is the antithesis of any scheme to equitably distribute the tax burden and wholly disregards the fact that since canned salmon must compete not only with other fish, but also with meats generally, the increased burden cannot be passed on to the consumer. If all this be true, Chapter 11 would appear to be the modern guise of an ancient tyranny.

It should be noted that decisions upholding tax statutes enacted by legislative bodies possessing both the power to regulate and to tax even though the taxes were confiscatory, such as McCray v. U. S., 195 U.S. 27, 24 S.Ct. 769, 49 L.Ed. 78, 1 Ann. Cas. 561; State Board of Tax Commissioner v. Jackson, 283 U.S. 527, 51 S.Ct. 540, 75 L.Ed. 1248, 73 A.L.R. 1464, 75 A. L.R. 1536; Magnano Co. v. Hamilton, 292 U.S. 40, 54 S.Ct. 599, 78 L.Ed. 1109; Fox v. Standard Oil Co., 294 U.S. 87, 55 S.Ct. 333, 79 L.Ed. 780, and Great Atlantic & Pacific Tea Co. v. Grosjean, 301 U.S. 412, 57 S.Ct. 772, 81 L.Ed. 1193, 112 A.L.R. 293, are inapposite. Alaska Fish Salting & By-Products Co. v. Smith, 255 U.S. 44, 41 S.Ct. 219, 65 L.Ed. 489, although applying the rule to a tax on fish products in the face of a showing of confiscation, is not controlling because that decision antedates the enactment of the White Act, with its guarantee here under consideration.

■ That a legislative body may not, under the guise of exerting the power to tax, accomplish a forbidden end, is well settled. Bailey v. Drexel Furniture Co., 259 U.S. 20, 42 S.Ct. 449, 66 L.Ed. 817, 21 A.L.R. 1432; Trusler v. Crooks, 269 U.S. 475, 46 S.Ct. 165, 70 L.Ed. 365; U. S. v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914. The question at the bar differs only in form from that presented in Freeman v. Smith, 9 Cir., 44 F.2d 703; Id., 62 F.2d 291. In holding that this very right, guaranteed by the White Act, cannot be impaired or destroyed by the Legislature, the Court said, 44 F.2d at page 704: "The territory, under the guise of taxation, has attempted to destroy a right conferred by Congress on citizens of the United States, and asserts the broad right to do so because it has been endowed with the power to tax, and the power to tax is the power to destroy. The latter proposition may be true in fact as well as in theory, but it cannot be carried to the extent of destroying rights conferred by the constitution or laws of the United States."

■ It would seem to follow as a corollary that the right to fish on a basis of equality guaranteed by the White Act includes the right to fish by any means permitted by law. Fishing with traps is expressly permitted by the White Act and regulations promulgated thereunder. 48 U.S.C.A. § 234; 50 C.F.R. 201.1–2, 201.4; Cum.Supp. 201.6–11; 1946 Supp., 201.23–26; 1947 Supp., 201.25a. See also Regulatory Announcement 25 of the Department of the Interior, Fish & Wildlife Service, containing the laws and regulations for the protection of the commercial fisheries of Alaska, 1949, Part 101, Page 13.

■ It is impossible to escape the conclusion that in imposing a tax on fish taken by traps which, in the highest bracket, is $72\frac{1}{2}$ times greater than under the law previously in force and which the defendants admit will result in an increase of 1,000% while leaving fish caught by seines and gill nets wholly untaxed, the Legislature must have been influenced by the referendum vote referred to rather than by any desire to fairly and equitably distribute the tax burden. This conclusion gains further support from the fact that there was no increase in any other excise tax even remotely approaching that on trap-caught fish. A similar situation confronted the court in Macallen Co. v. Massachusetts, 279 U.S. 620, 49 S.Ct. 432, 435, 73 L.Ed. 874, 65 A.L.R. 866. There the Court found that in enacting the challenged tax statute, the Legislature of Massachusetts had acted pursuant to a report of a committee recommending taxation of nontaxable bonds, and had imposed a tax indirectly through the medium of a so-called excise. Concluding that it was a scheme to reach a prohibited result the Court said: "Legislature may not, by an artful use of words, deprive this court of its authority to look beyond the words to the real legislative purpose. * * * the tax cannot be upheld without subverting the rule that ' * * * what cannot be done directly because of constitutional restriction cannot be accomplished indirectly by legislation which accomplishes the same result. * * * Constitutional provisions, whether operating by way of grant or limitation, are to be enforced according to their letter and spirit, and cannot be evaded by any legislation which, though not in terms tres-

passing on the letter, yet in substance and effect destroy the grant in limitation.' "

Here the tax singles out fish caught by one type of gear for discrimination and the imposition of a tax so excessive as to lead to the conclusion that it was not enacted to obtain needed revenue, but rather in obedience to what was apparently interpreted as a mandate from the voters to abolish the trap. The Act cannot be reconciled upon any other theory. Nor does it fit into the body of tax legislation of the Territory. It may be that confiscation or prohibition has not clearly been shown, but as I view the law, it need not be shown that the tax is prohibitive or confiscatory in an absolute sense, but only that it is so oppressive that, in practical operation and effect, the right to fish on a basis of substantial equality guaranteed by the White Act will be impaired. Freeman v. Smith, supra; Hynes v. Grimes Packing Co., 337 U.S. 86, 118, 122-123, 69 S.Ct. 968; Cf. Toomer v. Witsell, 334 U.S. 385, 397, 68 S.Ct. 1156. It may also be that where the question is one of degree, the distinction between oppressive taxation and impairment is a best somewhat tenuous, but I am convinced that there is no room for reasonable doubt here. Viewing the act under discussion against its legislative background and in its factual setting, I am convinced that the tax on fish caught in traps is so severe as to result in impairing the right referred to within the doctrine of Freeman v. Smith, supra, and that therefore Chapter 11 is to that extent void.