TERRITORY OF ALASKA ET AL. *v.* TROY, COL-
LECTOR OF CUSTOMS FOR THE DISTRICT OF
ALASKA.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF ALASKA, DIVISION NO. 1.

No. 392. Argued December 14, 15, 1921.—Decided February 27,
1922.

1. Alaska has been incorporated into and is part of the United
States; and the Constitution, so far as applicable, is controlling
upon Congress when legislating in respect thereto. P. 110.
2. Section 27 of the Merchant Marine Act, forbidding, with excep-
tions, transportation of merchandise over routes between points
within the United States in vessels not built in the United States
or documented under its laws and owned by its citizens, is a regula-
tion of commerce and not within § 8 of Art. I of the Constitution
requiring uniformity throughout the United States of duties, im-
posts and excises. P. 110.
3. Alaska is not a State, within § 9 of Art. I of the Constitution, de-
claring " No preference shall be given by any regulation of com-
merce or revenue to the ports of one State over those of another."
P. 111. *Downes* v. *Bidwell*, 182 U. S. 244, considered.
Affirmed.

APPEAL from a decree of the District Court of the
United States for the District of Alaska sustaining a de-
murrer to, and dismissing, the amended complaint, in a
suit brought by the Territory and the Juneau Hardware
Company to restrain the local Collector of Customs from
confiscating merchandise, shipped or to be shipped by the
Hardware Company or others in Alaska, from points in
the United States over Canadian Railroads to Canadian
ports, and thence to Alaska by British vessels not au-
thorized under § 27 of the Merchant Marine Act, or
merchandise to be shipped in like manner from Alaska to
the United States.

*Mr. John Rustgard,* Attorney General of the Territory of Alaska, for appellants.

Equal rights to trade and commerce and the equal right of access to the ports and markets of the various States are among property rights of citizens of the United States guaranteed to the people of Alaska by the treaty of cession. They are "privileges and immunities." Arts. of Confederation IV; Const., Art IV, § 2; *Slaughter-House Cases,* 16 Wall. 36; *Crandall* v. *Nevada,* 6 Wall. 35; *Lochner* v. *United States,* 198 U. S. 45.

When the people of the Territory of Alaska were admitted to the rights, privileges and immunities of American citizens, and when it was guaranteed to them that they should be maintained and protected in the free enjoyment of their property, it comprehended, not only the equal right to life and liberty, but the equal right to trade and commerce, the equal right of ingress and egress to and from the several States,—these being indispensable property rights. Nothing less is meant by the right to equal protection of the laws.

Independently of the treaty, Congress has expressly extended the Constitution to Alaska, first by § 1891, Rev. Stats., and later by § 3 of the Act of August 24, 1912, and this court has declared in several decisions that Alaska has been incorporated into the United States and forms an integral part thereof.

For this reason cl. 6, § 9, Art. I, of the Constitution protects the ports of Alaska to the same extent that it protects the ports of a State. *Loughborough* v. *Blake,* 5 Wheat. 317; *Rassmussen* v. *United States,* 197 U. S. 516; *Binns* v. *United States,* 194 U. S. 486.

It is conceded that the prohibition of this clause against discrimination by regulation of revenue applies to and protects an incorporated Territory. This protection would be futile unless it was accompanied by an inhibition against discrimination by regulation of commerce, and for

that reason the two are joined in the same clause. The history of the adoption of this clause of the Constitution demonstrates that, like the clause requiring uniformity of duties, it was intended to apply to the entire "American Empire." *Knowlton* v. *Moore,* 178 U. S. 107.

In the Insular Cases this court held that the clause in question would have operated to protect Porto Rico had that Territory been incorporated into the United States, the same as is Alaska, or had Congress expressly extended the Constitution to that island. *Downes* v. *Bidwell,* 182 U. S. 244, 249, 288, 292, 352, 354.

The word "State" as employed in the Constitution is frequently interpreted by this court to include a Territory. For instance, in the cl. 3 of § 8 where authority is given "to regulate commerce with foreign nations and among the several States, and with the Indian tribes," this court has held it applies to commerce between a State and a Territory. Similar results have been obtained from construction of cl. 5, § 9, Art. I; cl. 1 and 2, § 10; cl. 1, § 2, Art. IV, and the Fourteenth Amendment. In dealing with an incorporated Territory, Congress may act as a federal legislature or as a local legislature. Acting as a federal legislature it is bound by the general limitations of the Constitution. Acting as a local legislature it has such powers as are possessed by a state legislature, but no more.

The law here in question was enacted by Congress in its federal capacity and under the commerce clause. Laws enacted under that power must be uniform and deal equally with all.

Whether acting as a federal or a territorial legislature, Congress has no power to deny the people of any Territory to which the Constitution has been extended the same rights of commerce accorded to the people of other parts of the country. See *Passenger Cases,* 7 How. 492; *Downes* v. *Bidwell,* 182 U. S. 360; *Dred Scott* v. *Sandford,* 19 How. 393; *United States* v. *Morris,* Fed. Cas. No.

15,815; *Murphy* v. *Ramsey,* 114 U. S. 15; *Dooley* v. *United States,* 183 U. S. 151, 168, 171, 172, 173; *Pope* v. *Williams,* 193 U. S. 632; *United States* v. *Anthony,* Fed. Cas. No. 14,459; *Stone* v. *Smith,* 159 Mass. 414; *Stoutenburgh* v. *Hennick,* 129 U. S. 141.

Clause 2 of § 3, Art. IV, was not intended to in any manner deny to the people of a Territory the rights of American citizens, but was intended to give Congress power to deal with internal affairs of the embryo States until they were able to assume the duties of their own sovereignty. This section of the Constitution must be read in conjunction with the Ordinance of 1787 which remained in full force and effect after the Constitution was adopted, and has been construed as applicable to all the Territories incorporated into the Union after the adoption of the Constitution. Meigs, The Growth of the Constitution in the Federal Convention of 1787; *Spooner* v. *McConnell,* Fed. Cas. No. 13,245; *Cincinnati* v. *Louisville & Nashville R. R. Co.,* 223 U. S. 390; *Choisser* v. *Hargraves,* 2 Ill. 317; *Palmer* v. *Cuyahoga County,* Fed. Cas. No. 10,688.

It is not necessary to allege in the complaint that the rate tariffs had been filed with the Interstate Commerce Commission or that the latter has established through rates.

The entire § 27 of the Act of 1920 is void because it discriminates in favor of that part of the United States which is on the continent and situated between Canada and Mexico. The executive departments can not render it valid by extending the law to the Territories which it expressly excludes. Nor can the courts render the law constitutional by giving it an interpretation which Congress expressly provides that it should not have.

*Mr. Solicitor General Beck* for appellee.

An examination of each reference in the Constitution to the States shows that with but few exceptions the word

" State " was intended to be construed literally. It must be admitted that in the commerce clause " among the several States " imported a sphere of power that was in part beyond the State, and the words " with the Indian tribes," most of which then lived in the Territories, clearly show that power was given to the Congress to regulate all commerce, except that which was wholly within a State. Hence, commerce with the Territories is expressly included in this grant of power. And it must also be admitted that in the matter of the fundamental personal rights of the individual, his rights were safeguarded by the pertinent provisions of the Constitution and the amendments, no matter where he might be under our flag.

But, in general, it is clear that the term " State," or " the several States," has a precise and definite signification, and that the word " Territory " has a similar precise meaning.

There is also a clear and distinct difference between the meaning of the word " State " in the original Constitution, which concerned itself almost wholly with the distribution of powers between the Federal Government and the States, and the amendments to the Constitution, the first ten of which were intended as a Bill of Rights to guarantee the liberty of the individual.

If in the clause of the Constitution which provides that no preference shall be given " to the ports of one State over those of another " it had been intended to refer to the Territories, would not the clause have read " no preference shall be given by any regulation of commerce or revenue to any port in the United States "?

It is quite obvious that the economic question as to how Congress shall regulate foreign and interstate commerce by regulating ports of entry is not, in any true sense, a question of personal right. It is an economic and political question, which concerns States and not individuals. " What is forbidden, is not discrimination

between individual ports within the same or different States, but discrimination between States." *Pennsylvania* v. *Wheeling & Belmont Bridge Co.*, 18 How. 421, 435.

The remainder of the clause—" Nor shall vessels bound to, or from, one State, be obliged to enter, clear, or pay duties in another "—shows also that this clause of the Constitution was placed there for the protection of the States. The immunity from discrimination is a reserved right on the part of the constituent States and does not pertain to individual ports, much less to individual persons.

Outside of the States and in the Territories and colonial dependencies of the United States, the question of uniform treatment of ports of entry is one of governmental policy. It is well known that the purpose of this provision was to allay the alarm of the various States, if the plenary power over foreign commerce was granted to the Federal Government.

There was an obvious reason why they did not extend this assurance of equal terms to the ports of a Territory. They did not have in mind ports of a Territory, for none such existed. The " Territory " contained no " port " in the sense of the word in which the framers used the term. This becomes the more obvious if it be recalled that the original conception of the commerce clause related only to commerce by vessels, whether trans-Atlantic or coastwise. It is quite clear that internal land transportation was not at first regarded as a part of the commercial power of the Union. *Perrin* v. *Sikes*, 1 Day (Conn.) 19; 2 McMaster, History of the American People, p. 60. Cf. *Conway* v. *Taylor's Executor*, 1 Black, 603.

Moreover, the clear distinction of governmental power between States and Territories must constantly be borne in mind. As to the States, there was only a limited delegation of power, subject to many reservations and quali-

fications.   As to the Territory, there was a plenary power to deal with it as the property of the United States, to the extent even of disposing of it at the pleasure of the Federal Government.

The reason which impelled the framers of the Constitution to separate the clause now under consideration, with respect to preferential treatment of ports, from that which refers to uniformity of taxation, and the addition of the words " of revenue " in the former clause, when the latter provision, by its requirement of uniformity of taxes throughout the United States, effectually prevented the imposition by the Federal Government of different duties at different ports, are explained when due consideration is given to the fundamental distinction, which the framers of the Constitution always had in mind, between a tax that was levied as a mere regulation of commerce and not for revenue and a pure revenue tax.   Today, that distinction has been almost wholly lost sight of in discussing the constitutional questions which underlay the American Revolution; and yet no distinction was more clearly recognized by the men of that era or more tenaciously adhered to.

The phrase " taxation without representation " had reference to taxes, which were levied upon the colonists for the purpose of revenue.   Chief Justice Marshall referred to this distinction in *Gibbons* v. *Ogden,* 9 Wheat. 1, 12.   His remarks are fully borne out by history; and the classification of import duties into revenue duties and regulations of commerce lay at the basis of the American doctrine which led to the Revolutionary War.   We may refer to the journals of the Continental Congress, vol. I, pp. 28, 175, 176; vol. II, p. 189; the examination of Dr. Benjamin Franklin at the bar of the House of Commons on February 7, 1776, 1 Bigelow's Life of Franklin, pp. 478, 479; John Dickinson's Letters from a Farmer, published in 1768, pp. 15, 18–19, 37–42, 43, note, 60, 61, 66; Dr. Franklin's letter to

Joseph Galloway of February 25, 1775, 8 Spark's Franklin's Works, p. 147; John Adams' letter to Jay of July 19, 1785, Works of John Adams, vol. 8, pp. 282, 283. The same view was maintained by the leading jurists and statesmen of the first two generations after the adoption of the Constitution; and with practical unanimity they based the protective tariff duties on the commerce clause of the Constitution. 1 Story on the Constitution, § 963; 2 *id.*, 1080, *et seq.*; James Madison's letter to Joseph C. Cabell of March 22, 1827, Writings of James Madison, Lippincott ed., vol. 3, p. 571; his letter to Cabell of September 18, 1828, *id.*, p. 636; Henry Clay's reply to Barbour, March 31, 1824, Annals of Congress, p. 1994; Gulian C. Verplanck's Letter to Drayton, New York, 1831, pp. 21–23; Speech of Thomas Smith Grimké, etc., Charleston, 1829, p. 51.

In the proceedings of the Constitutional Convention, the clause in controversy was removed from the clause which required uniformity of taxation and attached to the clause which forbade any State to impose an export duty. It seems clear that they separated the two clauses because of the distinction referred to. Would it not be most inadvisable to hold that the Constitution requires that the United States, in whatever exercise of world power it may hereafter assume, shall deal with all ports of entry which are subject to its jurisdiction with absolute equality?

If the Fathers had anticipated the control of the United States over the far-distant Philippine Islands, would they, whose concern was the reserved rights of the States, have considered for a moment a project that any special privilege which the interests of the United States might require for the ports of entry of the several States should, by compulsion, be extended to ports of entry of colonial dependencies, living in a different civilization and having economic interests which might be wrecked by the application of the rule of equality?

MR. JUSTICE McREYNOLDS delivered the opinion of the court.

In the court below appellants' bill was dismissed upon demurrer. It attacks the validity of § 27, Merchant Marine Act of June 5, 1920, c. 250, 41 Stat. 988,[1] upon the ground that the regulation of commerce prescribed therein gives a preference to ports of the Pacific Coast States over those of Alaska, contrary to § 9, Art. I, Federal Constitution—" No preference shall be given by any regulation of commerce or revenue to the ports of one State over those of another."

The act purports among other things " to provide for the promotion and maintenance of the American merchant marine," and § 27 forbids transportation of mer-

---

[1] Act of June 5, 1920.—To provide for the promotion and maintenance of the American merchant marine, to repeal certain emergency legislation, and provide for the disposition, regulation, and use of property acquired thereunder, and for other purposes.

Sec. 27. That no merchandise shall be transported by water, or by land and water, on penalty of forfeiture thereof, between points in the United States, including Districts, Territories, and possessions thereof embraced within the coastwise laws, either directly or via a foreign port, or for any part of the transportation, in any other vessel than a vessel built in and documented under the laws of the United States and owned by persons who are citizens of the United States, or vessels to which the privilege of engaging in the coastwise trade is extended by sections 18 or 22 of this Act: *Provided,* That this section shall not apply to merchandise transported between points within the continental United States, excluding Alaska, over through routes heretofore or hereafter recognized by the Interstate Commerce Commission for which routes rate tariffs have been or shall hereafter be filed with said commission when such routes are in part over Canadian rail lines and their own or other connecting water facilities: *Provided further,* That this section shall not become effective upon the Yukon river until the Alaska Railroad shall be completed and the Shipping Board shall find that proper facilities will be furnished for transportation by persons citizens of the United States for properly handling the traffic.

chandise over any portion of the route between points in the United States *including* Alaska " in any other vessel than a vessel built in and documented under the laws of the United States and owned by persons who are citizens of the United States, or vessels to which the privilege of engaging in the coastwise trade is extended by sections 18 or 22 of this Act," *provided* that under certain conditions this limitation shall not apply to merchandise transported between points within the United States, *excluding* Alaska, over through routes by Canadian rail lines and connecting water facilities.

The bill assumes that the preference is obvious upon a consideration of the statute without more. And although by fostering lines of boats which afford frequent, regular and speedy service, and otherwise, the practical effect may be highly beneficial to Alaskan ports, nevertheless, in view of the record, we will assume that the act does give preference to ports of the States over those of the Territory.

Alaska has been incorporated into and is part of the United States, and the Constitution, so far as applicable, is controlling upon Congress when legislating in respect thereto. *Rassmussen* v. *United States,* 197 U. S. 516, 525, 528. It has been organized and is governed under appropriate congressional action. For present purposes, therefore, we need not inquire into the object and scope of the treaty of cession.

The questioned regulation relates directly to commerce and clearly is not within the usual meaning of the words of § 8, Art. I, of the Constitution—"All duties, imposts and excises shall be uniform throughout the United States." That such regulations are not controlled by the uniformity clause was pointed out in *Cooley* v. *Board of Wardens of Port of Philadelphia,* 12 How. 299, 314:

" But, having previously stated that, in this instance, the law complained of does not pass the appropriate line

which limits laws for the regulation of pilots and pilot-
age, the suggestion, that this law levies a duty on tonnage
or on imports or exports, is not admissible; and, if so, it
also follows, that this law is not repugnant to the first
clause of the eighth section of the first article of the Con-
stitution, which declares that all duties, imposts, and ex-
cises shall be uniform throughout the United States; for,
if it is not to be deemed a law levying a duty, impost, or
excise, the want of uniformity throughout the United
States is not objectionable."

The appellants insist that " State " in the preference
clause includes an incorporated and organized territory.
This word appears very often in the Constitution and as
generally used therein it clearly excludes a " Territory."
To justify the broad meaning now suggested would re-
quire considerations more cogent than any which have
been suggested. Obviously, the best interests of a de-
tached territory may often demand that its ports be
treated very differently from those within the States.
And we can find nothing in the Constitution itself or its
history which compels the conclusion that it was intended
to deprive Congress of power so to act. See *Pennsylvania
v. Wheeling & Belmont Bridge Co.,* 18 How. 421; *Knowl-
ton* v. *Moore,* 178 U. S. 41, 107.

Great weight is attributed to certain statements con-
cerning the preference clause found in the several opin-
ions announced in *Downes* v. *Bidwell,* 182 U. S. 244, 249,
288, 352, 354, 355. But none of these opinions was ac-
cepted by a majority of the court and statements therein
are not binding upon us. That controversy grew out of
a revenue measure and the point now presented was not
directly involved. The writers used the language relied
upon in arguments intended to support their particular
views concerning the fundamental points. Without at-
tempting to ascertain the exact purport of these expres-
sions it suffices to say that they afford no adequate sup-
port for appellants' position.

A quotation from the opinion of the court in *Rassmussen* v. *United States,* 197 U. S. 516, 520, is apposite:

"In *Dorr* v. *United States,* 195 U. S. 138, the question was whether the Sixth Amendment was controlling upon Congress in legislating for the Philippine Islands. Applying the principles which caused a majority of the judges who concurred in *Downes* v. *Bidwell,* 182 U. S. 244, to think that the uniformity clause of the Constitution was inapplicable to Porto Rico, and following the ruling announced in *Hawaii* v. *Mankichi,* 190 U. S. 197, it was decided that, whilst by the treaty with Spain the Philippine Islands had come under the sovereignty of the United States and were subject to its control as a dependency or possession, those Islands had not been incorporated into the United States as a part thereof, and therefore Congress, in legislating concerning them, was subject only to the provisions of the Constitution applicable to territory occupying that relation."

The judgment below is

*Affirmed.*