**ANDERSON et al. v. MULLANEY, Commissioner of Taxation of Territory of Alaska.**

No. 12586.

United States Court of Appeals Ninth Circuit.

June 25, 1951.

Writ of Certiorari Granted Nov. 5, 1951.

See 72 S.Ct. 111.

Wm. L. Paul, Jr., Juneau, Alaska, and Roy E. Jackson, Carl B. Luckerath, and Norman Ackley, Seattle, Wash., for appellant.

J. Gerald Williams, Atty. Gen. of Alaska, John H. Dimond, Asst. Atty. Gen., for appellee.

Before DENMAN, Chief Judge, and ORR and POPE, Circuit Judges.

POPE, Circuit Judge.

Chapter 66 of the Session Laws of Alaska 1949, enacted March 21, 1949, requires all commercial fishermen who take fish from the fishery resources of Alaska to obtain an annual license from the Territorial Tax Commissioner. For such li-

cense the fee charged a resident fisherman is $5; that charged a nonresident fisherman is $50.[1] The statute also prohibits other persons from employing, or purchasing fish from, any unlicensed fisherman.

Anderson, Secretary-Treasurer of the appellant Union, and the Alaska Fishermen's Union, on behalf of some 3200 of its members who are nonresidents, and who fish in Alaska each year, brought this action seeking a declaration of the court that Chapter 66 is unconstitutional and void insofar as it seeks to exact the $50 nonresident license fee, and praying for an injunction restraining the appellee Commissioner of Taxation from making collection.[2]

The court made findings that "6. Thousands of nonresident fishermen come to Alaska each year and engage in fishing for salmon during the fishing season, which varies from twenty days in Bristol Bay to two months elsewhere. Said nonresident fishermen come to the Territory shortly before the fishing season and depart therefrom immediately after the close of the fishing season. Said nonresidents own no property in the Territory, and are not required by shipping laws to enter or clear upon arrival in or departure from the Territory. During the time said nonresidents are within the Territory, they enjoy the protection of local government. 7. Defendant and his deputies have detected evidence indicating large scale evasions of payment of the fishermen's license tax by nonresident fishermen. In order to enforce collection of this tax from the nonresident fishermen, defendant found it necessary to send an enforcement officer each year throughout the various fishing areas located along the 26,000 miles of Alaska coastline. The difficulties encountered by defendant and his deputies in the collection of license taxes from nonresident fishermen and the detection and apprehension of those who evade payment of this tax are almost insuperable. 8. Little difficulty is encountered by defendant and his deputies in the collection of the license tax from resident fishermen. There are few attempts at evasion by this class of fishermen, and since resident fishermen are within the jurisdiction of the Territory after the close of the fishing season, the detection and apprehension of those who do evade payment of the tax is not difficult. 9. It is much more difficult and expensive to collect the license tax from nonresident fishermen than it is from resident fishermen. Approximately 90% of the cost of collecting the fishermen's license taxes is incurred in collecting or attempting to collect said taxes from nonresident fishermen. 10. The net annual earnings of trollers for a season of four or five months average approximately $3,500.00; of gill netters in Bristol Bay approximately $2,500.00 for a season of twenty days; and the average earnings of those employed on cannery tenders and traps are approximately $1,500.00 and $2,000.00, respectively."

The court concluded that Chapter 66 did not "contravene the Fourteenth Amendment to the Constitution, the Civil Rights Act, or the Organic Act of Alaska; does not encroach upon the admiralty jurisdiction of the United States or affect its substantial uniformity; and does not burden interstate commerce in violation of Article I, Section 8, of the Constitution. The classification of fishermen into residents and nonresidents as contained in Chapter 66 is valid because it rests on substantial differences bearing a fair and reasonable

1. The statute appears to limit issuance of licenses to one who is a citizen of the United States or who "possesses a valid declaration of intention" to become such, and hence would seem to collide with Takahashi v. Fish and Game Commission, 334 U.S. 410, 68 S.Ct. 1138, 92 L. Ed. 1478. This aspect of the law is not involved here.

2. It appears that Anderson, since his election as Secretary-Treasurer of the Union, has not fished, and his residence is not shown. No question has been raised as to whether the Union is a real party in interest, or has the capacity to sue, hence we assume its right to sue on behalf of its members who are nonresidents of Alaska. Cf. note 10, United Public Workers v. Mitchell, 330 U.S. 75, at page 82, 67 S.Ct. 556, 91 L.Ed. 754.

relation to the object of the legislation. The $50.00 license fee imposed on non-resident fishermen under Chapter 66, is reasonable and not excessive."

Accordingly, the complaint was dismissed.

Upon this appeal Anderson and the Union contend that because of its discriminatory features the Act is in violation of the Organic Act, 48 U.S.C.A. § 21 et seq.[3] the Civil Rights Act, 8 U.S.C.A. § 41,[4] that portion of § 2, Article IV of the Constitution relating to privileges and immunities of citizens, and the equal protection clause of the Fourteenth Amendment. It is also attacked as a burden on interstate commerce and void for that reason. Appellants further assert that the findings above quoted are not sustained by the evidence.

In disposing of the contention that the Alaska statute imposes an unconstitutional burden upon interstate commerce the trial judge said: "Since * *. * it is well settled that a tax of this kind is not a burden on interstate commerce because the taxable event—the taking of fish—occurs before the fish have entered the flow of commerce, Toomer v. Witsell, 334 U.S. 385, 394, [68 S.Ct. 1156, 92 L.Ed. 1460]

* * * these contentions will not be discussed."[5] We think the problem presents more difficulty than the trial judge thought.

We assume that the trial court had in mind no more than the fact that the product of the canneries would ultimately be sold in the States. But a reference to the court's findings and to the evidence in the record discloses that the interstate shipment of the product is only one part of the complete picture. It is only the final end of the interstate assembly line which puts the fish on the tables of the consumer. The other end of this great integrated enterprise, which follows uniform patterns from year to year, concerns the massive migratory movement of the fishermen from their homes in the Pacific Coast States into Alaska for the annual fish season.[6] The evidence shows that some of these fishermen are employed by the canneries and others sell their catches to the same canneries from whence the product is marketed in the States. While local Alaskan residents are also fishermen employed in the same enterprise and in the same manner as the nonresidents, yet the greater number of fishermen and the best qualified ones are those who reside in the States and who come into Alaska for the fishing season only.[7]

3. "The Constitution of the United States, and all the laws thereof which are not locally inapplicable, shall have the same force and effect within the said Territory as elsewhere in the United States." 48 U.S.C.A. § 23.

4. "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

5. The court's statement was taken from language used in the cited Toomer case with reference to a tax of one-eighth cent a pound on green shrimp. There is no comparable provision in the Alaska enactment.

6. The court found: "Plaintiff labor union maintained this action for the benefit of

its members who are classified as fishermen and who are classed as nonresidents, and who live principally within the States of Oregon, Washington and California, and who are employed by fish packing companies who operate fish packing canneries within the Territory of Alaska in the various fishing areas, and who employ fishermen in fishing with gill nets, trap fishermen, crews of tenders and other floating equipment used in the handling of fish in the Territory of Alaska."

7. The evidence was that the nonresident members of the Appellant Union "are mostly flown into Alaska" by the employers. Earlier records in this and the Supreme Court indicate that the California fishermen are moved back and forth in the employers' ships. Aragon v. Unemployment Compensation Commission, etc., 9 Cir., 149 F.2d 447, 450; Alaska Packers Ass'n v. Industrial Accident Comm., 294 U.S. 532, 542, 55 S.Ct. 518, 79 L.Ed. 1044.

Thus it is apparent that so far as Alaska fisheries are concerned, they are in the center of a great interstate movement which begins when the fishermen start north to fish and terminates with the delivery of the processed product to the dealers in the States. The catching of the fish is but an interlude in this large flow of commerce.[8]

■ This commerce is not "interstate" in the sense that it is from one State to another State. But this court has held that commerce between the States and a Territory which has become a part of the United States is interstate commerce. Inter-Island Steam Nav. Co. v. Territory of Hawaii, 9 Cir., 96 F.2d 412, 416, 417, and such has been assumed to be true in McLean & Co. v. Denver & Rio Grande R. R. Co., 203 U.S. 38, 49, 27 S.Ct. 1, 51 L. Ed. 78; Hanley v. Kansas City Southern Ry. Co., 187 U.S. 617, 620, 23 S.Ct. 214, 47 L.Ed. 333; and Inter-Island Steam Nav. Co. v. Territory of Hawaii, 305 U. S. 306, 313, 59 S.Ct. 202, 83 L.Ed. 189.

We shall have occasion later in this opinion to point out that without regard to whether this movement in commerce be denominated "interstate" or "state-to-territory" commerce, the limitations on the Territory's power to regulate it are not in any substantial respect different from those applicable to a State. We proceed therefore to consider the validity of such a law if Alaska were a State.

■ That in such case the movement of these fishermen into Alaska would constitute interstate commerce is elementary. As stated by Mr. Justice Stone in Colgate

v. Harvey, 296 U.S. 404, 444, 56 S.Ct. 252, 265, 80 L.Ed. 299: "This Court has many times pointed out that movements of persons across state boundaries are a part of interstate commerce subject to the regulation and entitled to the protection of the national government under the commerce clause. Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442; Hoke v. United States, 227 U.S. 308, 33 S.Ct. 281, 57 L.Ed. 523; [Town of Vidalia v. McNeely, 274 U.S. 676, 47 S. Ct. 758, 71 L.Ed. 1292; Gloucester Ferry Co. v. [Commonwealth of] Pennsylvania, 114 U.S. 196, 5 S.Ct. 826, 29 L.Ed. 158; cf. Passenger Cases [Smith v. Turner], 7 How. 283."[9] In this connection Mr. Justice Stone referred to Crandall v. State of Nevada, 1867, 6 Wall. 35, 18 L.Ed. 744, in which a Nevada capitation tax on persons leaving the State by railroad or other common carrier, was held unconstitutional. He said: "No one could doubt that if the decision had been made at any time after Baltimore & Ohio Railroad Co. v. Maryland (1874), 21 Wall. 456, 472, 22 L.Ed. 678, and until the present moment, it would have been rested on the commerce clause."

A more recent statement with respect to the movement of persons across State lines as interstate commerce was made in Edwards v. People of State of California, 314 U.S. 160, 172, 62 S.Ct. 164, 166, 86 L. Ed. 119, where, referring to Art. I § 8 of the Constitution, it was said that "it is settled beyond question that the transportation of persons is 'commerce' within the meaning of that provision."[10]

---

8. B. W. Denison: "Alaska Today", The Caxton Printers, Ltd., Caldwell, Idaho, 1949, p. 166: "The fisheries of Alaska are the backbone of the Territory's economy with regard to permanent value, employment, and taxable wealth. More than one-half the entire revenue collected by the Territorial government comes from the fisheries. The products of these fisheries and the supplies and equipment necessary to their operation make up the major items in cargo shipments to and from Alaska. In some years more than nine-tenths of all Alaska freight shipments have been related to the fisheries. The industry, however, draws on Alaska

for only about half of its labor. Operators point out that this is unavoidable, because of the sparse local population in most places and the highly seasonal nature of the business. * * * Seasonal employment is given to more than 20,000 persons."

9. The quotation is from the dissenting opinion. The opinion from which Mr. Justice Stone dissented has since been overruled in Madden v. Commonwealth of Kentucky, 309 U.S. 83, 60 S.Ct. 406, 84 L.Ed. 590.

10. Federal Base Ball Club v. National League, 259 U.S. 200, 42 S.Ct. 465, 66

We cannot avoid the fact that the movement of these better fishermen, upon whom the life of the industry depends, is a part of an established course of business and that their movement is one of established regularity. "In determining what is interstate commerce, courts look to practical considerations and the established course of business." Foster-Fountain Packing Co. v. Haydel, 278 U.S. 1, 10, 49 S.Ct. 1, 3, 73 L.Ed. 147, citing Swift & Co. v. U. S., 196 U.S. 375, 398, 25 S.Ct. 276, 49 L.Ed. 518; Lemke v. Farmers Grain Co., 258 U.S. 50, 55, 42 S.Ct. 244, 66 L.Ed. 458; Binderup v. Pathe Exchange, 263 U.S. 291, 309, 44 S.Ct. 96, 68 L.Ed. 308; Shafer v. Farmers Grain Co., 268 U.S. 189, 198, 200, 45 S.Ct. 481, 69 L.Ed. 909.

We also think it obvious that whatever the motive which prompted the Alaska legislature in imposing the discriminatory tax upon the nonresident fishermen, the necessary effect of the discrimination was to discourage, hamper and burden this interstate movement of fishermen.

In dealing with those aspects of the Commerce Clause which make it a limitation upon the power of the State, Mr. Justice Frankfurter, speaking for the court in Freeman v. Hewit, 329 U.S. 249, 252, 67 S.Ct. 274, 276, 91 L.Ed. 265, said: "Our starting point is clear. In two recent cases we applied the principle that the Commerce Clause was not merely an authorization to Congress to enact laws for the protection and encouragement of commerce among the States, but by its own force created an area of trade free from interference by the States. In short, the Commerce Clause even without implementing legislation by Congress is a limitation upon the power of the States. Southern Pacific Co. v. [State of] Arizona, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915; Morgan v. [Commonwealth of] Virginia, 328 U.S. 373, 66 S.Ct. 1050 [90 L.Ed. 1317]. In so deciding we reaffirmed, upon fullest consideration, the course of adjudication unbroken through the Nation's history." [11] It cannot be said that the Alaska legislature has any greater freedom in burdening commerce between the States and the Territory than it would have if Alaska were a State.

The reason why the Territorial Legislature is thus limited is not that the Commerce Clause, ex proprio vigore, operates as a constitutional limitation. For so far as the Constitution is concerned, Congress might, we assume, confer upon a territory the power to impose burdens upon commerce between the territory and the States, for Congress may "make all needful Rules and Regulations" respecting the territories under Art. IV, § 3, cl. 2. Shively v. Bowlby, 152 U.S. 1, 48, 14 S.Ct. 548, 38 L.Ed. 331. But we cannot conceive that in granting legislative power to the Territorial Legislature it was intended that the power should exceed that possessed by the legislature of a State in dealing with commerce. The words "all rightful subjects of legislation" describing the extent to which the legislative power of the Territory should extend, 48 U.S.C.A. § 77, do not include the imposition upon commerce such as that here involved of burdens which a State might not create under like circumstances. "All rightful subjects of legislation" must be held to refer to matters local to Alaska.

A study of a long line of decisions of the Supreme Court ranging from Wel-

L.Ed. 898, is not to the contrary. There the transportation of the baseball players was a "mere incident" to an exhibition which "would not be called trade or commerce in the commonly accepted use of those words." The decision was based, in part, upon Hooper v. People of State of California, 155 U.S. 648, 15 S. Ct. 207, 39 L.Ed. 297, which may not have survived United States v. Southeastern Underwriters Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440. Here, where the annual migration is it-

seir a substantial and vital feature of an important industry, the case bears the same relationship to the Federal Club case as Lemke v. Farmers Grain Co., 258 U.S. 50, 42 S.Ct. 244, 66 L.Ed. 458, bears to Milk Control Board of Pennsylvania v. Eisenberg Farm Products, 306 U.S. 346, 59 S.Ct. 528, 83 L.Ed. 752.

11. The rationale of this aspect of the Commerce Clause is stated in Southern Pacific Co. v. State of Arizona, supra, 325 U.S. at page 768, 65 S.Ct. at page 1519.

ton v. State of Missouri, 91 U.S. 275, 23 L.Ed. 347, to Nippert v. City of Richmond, 327 U.S. 416, 66 S.Ct. 586, 90 L.Ed. 760, will disclose that the Court has held that State legislation imposing discriminatory taxes which may operate to affect adversely the movement of interstate commerce is prohibited by the Commerce Clause; and that through the many years covered by these cases, the Court has not become any less alert to protect commerce which concerns more States than one, and to see that it should not be impaired by state-enacted discriminations. "The commerce clause forbids discrimination, whether forthright or ingenious. In each case it is our duty to determine whether the statute under attack, whatever its name may be, will in its practical operation work discrimination against interstate commerce." Best & Co. v. Maxwell, 311 U.S. 454, 455, 61 S.Ct. 334, 335, 85 L.Ed. 275.

When we consider that the movement of the fishermen themselves constitutes interstate commerce, it is apparent that the problem presented by appellant's contention cannot be disposed of by saying that "the taxable event—the taking of the fish—occurs before the fish have entered the flow of commerce." It is true that the taking of the fish is a local incident, but if the tax in its practical operation has a discriminatory impact upon some aspect of interstate commerce, the local tax cannot be sustained by simply tying it to a local incident.

Illustrations of this proposition are found in Best & Co. v. Maxwell, supra, and in Nippert v. Richmond, 327 U.S. 416, 66 S.Ct. 586, 587, 90 L.Ed. 760. In Best & Co., the privilege tax there involved was levied upon one "who displays samples in any hotel room rented or occupied temporarily for the purpose of securing retail orders." In the Nippert case, the license tax was imposed for "engaging in business as solicitor" within the city. It was there urged that the tax was imposed upon "mere solicitation", which was a "local incident". Of this argument the court said: "If the only thing necessary to sustain a state tax bearing upon interstate commerce were to discover some local incident which might be regarded as separate and distinct from 'the transportation or intercourse which is' the commerce itself and then to lay the tax on that incident, all interstate commerce could be subjected to state taxation and without regard to the substantial economic effects of the tax upon the commerce. For the situation is difficult to think of in which some incident of an interstate transaction taking place within a state could not be segregated by an act of mental gymnastics and made the fulcrum of the tax."

The Nippert case dealt with the impact of a tax upon an out-of-state merchant, as compared with the local one. The fishermen who sell their catches to the canneries are not in any fundamental sense in any different position than merchants. And of the Richmond taxes upon the latter, the court said in striking them down: "They are discriminatory in favor of the local merchant as against the out-of-state one."

We think that a correct statement of the rule of Best & Co. v. Maxwell, supra, and Nippert v. Richmond, supra, is to be found in the opinion of Mr. Justice Reed in Memphis Natural Gas Co. v. Stone, 335 U.S. 80, 87, 68 S.Ct. 1475, 1478, 92 L.Ed. 1832, where, in citing those two cases he said: "But the choice of a local incident for the tax, without more, is not enough. There are always convenient local incidents in every interstate operation. Nippert v. City of Richmond, supra, 327 U.S. at [page] 423, 66 S.Ct. [at page] 589 * * *. Again, where there is a state exaction for some intrastate privilege that discriminates against interstate commerce, it is invalid even though it is sufficiently disconnected from the commerce to be taxable otherwise." It is therefore no answer to appellant's contention that the discriminatory tax here involved was imposed upon the fishing.

Many cases have involved State taxes upon "drummers". Such taxes have found condemnation because of the discrimination which results from their "practical operation". Referring to them the court said in Nippert v. Richmond, supra, *327*

U.S. at pages 424–425, 66 S.Ct. at page 590: "Thus the essence of the distinction taken in the Berwind-White case was that the taxes outlawed in the drummer cases in their practical operation worked discriminatorily against interstate commerce to impose upon it a burden, either in fact or by the very threat of its incidence, which they did not place upon competing local business and which the New York sales tax did not create." See Best & Co. v. Maxwell, 311 U.S. 454, 61 S.Ct. 334, 85 L.Ed. 275; cf. Nelson v. Sears, Roebuck & Co., 312 U.S. 359, 61 S.Ct. 586, 85 L.Ed. 888.

"As has been so often stated but nevertheless seems to require constant repetition, not all burdens upon commerce, but only undue or discriminatory ones, are forbidden. For, though 'interstate business must pay its way,' a state consistently with the commerce clause cannot put a barrier around its borders to bar out trade from other states and thus bring to naught the great constitutional purpose of the fathers in giving * * * the power 'To regulate Commerce with foreign Nations, and among the several States * * *'. Nor may the prohibition be accomplished in the guise of taxation which produces the excluding or discriminatory effect".

■ It would appear to be immaterial what purpose was sought to be served by the tax here under attack, whether to curtail the competition from outside fishermen in the interest of the local ones,[12] or simply to produce more revenue.[13] The promotion of such local objectives may not be accomplished by burdens upon interstate commerce. Baldwin v. Seelig, 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032, "laid repeated emphasis upon the principle that the State may not promote its own economic advantages by curtailment or burdening of interstate commerce". H. P. Hood & Sons v. Du Mond, 336 U.S. 525,

532, 69 S.Ct. 657, 662, 93 L.Ed. 865. Cf. Foster-Fountain Packing Co. v. Haydel, supra, 278 U.S. at page 13, 49 S.Ct. 1, 73 L.Ed. 147, Toomer v. Witsell, supra, 334 U.S. at page 403, 68 S.Ct. 1156, 1161, 92 L.Ed. 1460.

The right of the Territory to impose taxes upon the property used in this commerce or upon sundry aspects of the enterprise including the business or occupation of fishing, cannot be questioned. It has always been held that "interstate business must pay its way". Nippert v. Richmond, supra, 327 U.S. at page 425, note 14, 66 S.Ct. at page 590. It may be required to pull its own weight in the State's internal economy. Western Live Stock v. Bureau of Revenue, 303 U.S. 250, 253, 58 S.Ct. 546, 82 L.Ed. 823. Such non-discriminatory taxes on the fisheries industry were upheld in Pacific American Fisheries v. Territory of Alaska, 269 U.S. 269, 46 S.Ct. 110, 70 L.Ed. 270, and Alaska Fish, Etc., Co. v. Smith, 255 U.S. 44, 41 S.Ct. 219, 65 L.Ed. 489.

■ But if the tax be laid in such fashion as to discriminate against interstate commerce, it must be denounced as a burden on such commerce, and an enactment of such character is not to be permitted to the local legislature.

We must next determine the bearing upon this situation of certain decisions of the Supreme Court and of this court, some of which were cited in the opinion of the trial court. That court mainly relied upon Toomer v. Witsell, supra, as authority for its conclusion that the tax established by the Alaska statute did not burden interstate commerce. In that case the Supreme Court had occasion to deal with three separate taxes, under three different sections of a South Carolina statute relating to shrimp fishing. Code 1942, § 3374, which imposed a tax of one-eighth cent a pound on green shrimp, the court upheld as not

---

12. Denison, "Alaska Today", (supra, note 7), p. 168: "The mass movement of these employees from Puget Sound and from San Francisco has been fine for the boat lines and West Coast labor unions, but has done more to retard permanent growth of population in Alaska than any other cause."

13. Denison, "Alaska Today", supra, p. 174: "Cod fishing on the continental shelf off Alaska shores is undertaken mostly by fishermen from San Francisco or Puget Sound. If Alaska had a license fee from this and other forms of gratuitous fishing in its waters, the Territory would gain considerable additional revenue; * * *"

a burden upon interstate commerce. It was in connection with this tax, which finds no counterpart in the Alaska statute, that the court said: "It does not discriminate against interstate commerce in shrimp, and the taxable event, the taking of shrimp, occurs before the shrimp can be said to have entered the flow of interstate commerce." The opinion of the trial court here alludes to this language, which obviously has nothing to do with any problem similar to the one we are here considering.

Another portion of the South Carolina Act, § 3414, which required owners of shrimp boats fishing in the maritime belt off South Carolina to dock at a South Carolina port to unload, pack, and stamp their catch before shipping it to another state, the court held to be a burden on interstate commerce in violation of the Commerce Clause. Section 3379 which imposed a discriminatory license tax on nonresidents of South Carolina was attacked upon the ground that the statute was said to violate the privileges and immunities clause of Article IV, § 2 and the equal protection clause of the Fourteenth Amendment. Since the court sustained the contention that the section violated Article IV, § 2, it had no occasion to say anything as to whether the same section was also void under the commerce clause. However, Mr. Justice Frankfurter, Mr. Justice Jackson and Mr. Justice Rutledge in concurring opinions expressed the view that the discriminatory license tax was void under the Commerce Clause.

In Haavik v. Alaska Packers Ass'n, 263 U.S. 510, 44 S.Ct. 177, 68 L.Ed. 414, the court held valid a Territorial act, Laws 1921, c. 31, which imposed an annual license tax of $5 upon nonresident fishermen although none was imposed upon resident fishermen. The court said, 263 U.S. at page 515, 44 S.Ct. at page 178: "We are not here concerned with taxation by a state. The license tax cannot be said to conflict with section 2, art. 4, of the Constitution:

" 'The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states.'

"It applies only to nonresident fishermen; citizens of every state are treated alike. Only residents of the territory are preferred. This is not wholly arbitrary or unreasonable, and we find nothing in the Constitution which prohibits Congress from favoring those who have acquired a local residence and upon whose efforts the future development of the territory must largely depend."

In Freeman v. Smith, 9 Cir., 44 F.2d 703 and Id., 9 Cir., 62 F.2d 291, this court held void an Alaska statute which exacted $250 annually for a fishing license from nonresidents, while residents were charged but $1.00. Laws 1929, c. 96. The decision was in large part predicated upon the provisions of the Act of Congress of June 6, 1924, 43 Stat. 464, 48 U.S.C.A. § 221 et seq., known as the White Act, which delegated to the Secretary of Commerce the power to set apart and reserve fishing areas in the waters of Alaska, to establish rules regulating the taking of fish therein, and providing "That every such regulation made by the Secretary of Commerce shall be of general application within the particular area to which it applies, and that no exclusive or several right of fishery shall be granted therein, nor shall any citizen of the United States be denied the right to take, prepare, cure, or preserve fish or shellfish in any area of the waters of Alaska where fishing is permitted by the Secretary of Commerce." 48 U.S.C.A. § 222.

It was held that the Territorial provision for such licenses was in conflict with this Act of Congress and it was said that even if it were to appear that a fisherman might catch fish to the value of $3000 during one season the $250 license fee was an unreasonable infringement upon his right to fish thus granted by Congress.

In Anderson v. Smith, 9 Cir., 71 F.2d 493, 495, this court upheld an Alaska statute exacting an annual license fee of $25 from nonresident fishermen and which fixed the license fee of resident fishermen at $1.00. Laws 1933, c. 30. In that case the court alluded to the Act of June 6, 1924, upon which its decisions in the Freeman case had been based, and noted that the same Act contained a proviso that "nothing

in sections 221 to 228 of this title contained, nor any powers conferred by said sections upon the Secretary of Commerce, shall abrogate or curtail the powers granted the Territorial Legislature of Alaska to impose taxes or licenses, nor limit or curtail any powers granted the Territorial Legislature of Alaska by sections 23, 24, 44, 45, and 67 to 90 of this title." Title 48 U.S. C.A. § 228. This court then said, 71 F.2d at page 495: "The question involved here, then, is not the power of the Legislature to discriminate between residents and nonresidents, but the question is whether or not the license fee imposed by the territorial Legislature is an unreasonable interference with a right granted by Congress, and, therefore, impliedly prohibited by Congress. It is clear then that so long as the license tax imposed by the territorial Legislature upon the citizens of the United States who are not residents of Alaska is not so exorbitant as to practically prohibit, or so unreasonable as to interfere with, the exercise of the right granted by Congress, it is within the power of the territorial Legislature. We cannot say that the license fee imposed by territorial Legislature in 1933 and now under attack is so unreasonable as to conflict with the act of Congress granting the right to fish."

In the Haavik case, supra, the specific problem dealt with by the court was the application of § 2 of Article IV of the Constitution—"The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States". And because the record there did not disclose the facts here involved, namely, the regular and extensive transportation of fishermen to and from the Territory, it cannot be said that the question here presented even lurked in that record, or was passed upon in that case.

The decision of this court in Anderson v. Smith, supra, had no occasion to deal with any problem related to interstate commerce, for no such issue was there involved. The only question determined was whether the license fee was so exorbitant as to prohibit the fishing which Congress had permitted.

We are of the opinion that the question here involved has not previously been determined in any case which has been called to our attention.

We note that the discrimination here attacked cannot find any justification in the doctrine of McCready v. State of Virginia, 94 U.S. 391, 24 L.Ed. 248, which proceeded upon the theory of the State's ownership of fish and game. If it can be said that that case retains any authority after what was said of it in Toomer v. Witsell, 334 U.S. 385, 388, 400, 68 S.Ct. 1156, 92 L.Ed. 1460, and in Takahashi v. Fish and Game Comm., 334 U.S. 410, 420, 68 S.Ct. 1138, 92 L.Ed. 1478, it has no application here, for the Act of Congress of June 6, 1924, referred to above, and § 3 of the Organic Act, Title 48 U.S.C.A. § 24,[14] definitely negatives both Territorial proprietorship, and Territorial power to regulate fisheries. See P. E. Harris & Co. v. Mullaney, D.C., 87 F.Supp. 248.

We find in the record no facts which would operate to sustain the discrimination here effected. The trial court found that it could be upheld on account of the additional costs of enforcing the Act and collecting the tax in respect to the nonresident fishermen. If this were a problem arising from a discrimination in a field wherein the Territory had power to legislate, and where the discrimination was attacked as a denial of equal protection of the law, the factor of additional cost would be important and that might justify the classification. Such a case was Madden v. Commonwealth of Kentucky, 309 U.S. 83, 60 S.Ct. 406, 84 L.Ed. 590. But the effort to impose a discriminatory burden upon the movement of the nonresident fishermen took the Territorial Legislature into an area where it had no power to proceed. It was trespassing into a forbidden field. The existence of the discrimination demonstrates the invalidity of the enactment and overcomes any presumption of validity which might otherwise attach to the Act.

14. "The authority granted to the legislature * * * shall not extend to . * * * the game, fish, and fur seal laws * * * applicable to Alaska."

The narrow limits within which the Supreme Court has compelled State legislatures to operate in imposing taxes, which in some measure operate as a burden upon interstate commerce, serve to demonstrate the complete want of justification for the discrimination here imposed.

■ It is well settled that the States may impose burdens upon commerce entering their borders in connection with their inspection laws. But fees imposed under such inspection laws have been sustained only when their amount fairly represents the cost of the inspection. Great Northern Ry. v. State of Washington, 300 U.S. 154, 57 S.Ct. 397, 81 L.Ed. 573. The State may not add to the inspection fees amounts required by the State in order to police the enforcement of the law. Foote & Co. v. State of Maryland, 232 U.S. 494, 34 S. Ct. 377, 58 L.Ed. 698.[15]

The fact that taxes and charges imposed in excess of those permissible limits are prohibited to the States in connection with their inspection laws demonstrates that *a fortiori* the discriminatory tax here cannot be sustained. The Act had none of the aspects of an inspection law, and the burdensome charges here imposed are even less justifiable than those held bad in the cases just cited.

The trial court's findings with respect to the difficulties and the cost of enforcement of the collection of the license taxes from nonresident fishermen may well have been directed to an inquiry into those matters which the court in Toomer v. Witsell, supra, indicated might justify some discrimination in license fees charged resident and nonresident fishermen. In that case, in considering whether the discrimination by South Carolina with respect to license fees for shrimp boats owned by residents and for those owned by nonresidents were in violation of Article IV, § 2 relating to the privileges and immunities of citizens of the several States, the court, after finding no reason sufficient to justify the discrimination concluded by saying, 334

U.S. at page 398, 68 S.Ct. at page 1163: "Nothing in the record indicates that nonresidents use larger boats or different fishing methods than residents, that the cost of enforcing the laws against them is appreciably greater, or that any substantial amount of the State's general funds is devoted to shrimp conservation. But assuming such were the facts, they would not necessarily support a remedy so drastic as to be a near equivalent of total exclusion. The State is not without power, for example, to restrict the type of equipment used in its fisheries, to graduate license fees according to the size of the boats, or even to charge non-residents a differential which would merely compensate the State for any added enforcement burden they may impose or for any conservation expenditures from taxes which only residents pay. We would be closing our eyes to reality, we believe, if we concluded that there was a reasonable relationship between the danger represented by non-citizens, as a class, and the severe discrimination practiced upon them."

■ The trial court apparently was of the opinion that the validity of the Act here in question must be judged by the standards applied in Toomer v. Witsell. We find it unnecessary here to consider whether the limitations of the Privileges and Immunities Clause of Article IV, § 2 are applicable to the facts of this case, for as we have indicated, we think that the tax here in question imposes a burden upon commerce between the States and the Territory in such manner that if Alaska were a State the tax would be void and unenforcible. And because it cannot be said that the Territorial Legislature has any greater power to impose a burden upon such commerce than might be exercised by that of the State, we must conclude that so much of the tax as exceeds that charged resident fishermen is void.

Appellants have argued that § 3 of the Organic Act for Alaska which provides that the Constitution of the United States

---

15. In this case, and the Grt. Northern Ry. case, supra, it was said the burden was upon the State to demonstrate that the fees did not exceed these permissible limits.

"shall have the same force and effect within the said Territory as elsewhere in the United States", 48 U.S.C.A. § 23, operated to make the Territorial Legislature subject to the requirements of Article IV, § 2 of the Constitution: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States". It is said that this provision controls Alaska legislation in the same manner in which it controls the legislation of any State. It is argued therefore that the discriminatory license tax is void for the reasons stated in the Toomer case.

If that premise be sound, a matter upon which we are not required to pass, it must be admitted that the findings of the court and the facts in the record would not be sufficient to measure up to the tests laid down in the Toomer case where it was said, 334 U.S. at page 398, 68 S.Ct. at page 1163: "The State is not without power, * * * to charge nonresidents *a differential which would merely compensate the State for any added enforcement burden they may impose* or for any conservation expenditures from taxes which only residents pay." (Emphasis added.) For here, while the findings were that "90% of the cost * * * is incurred in collecting or attempting to collect said taxes from nonresident fishermen," the record is barren of evidence of what this 90% amounted to. The $45.00 differential on the 3200 nonresident fishermen of the plaintiff Union alone would produce $144,000. It may be inferred from the record that the differential collected from all nonresident fishermen would be not less than twice that amount. The added enforcement cost shown in the record is only a minor fraction of the amount collected, and since such a discrimination by a State need not be exclusionary in amount to be in violation of Article IV, § 2, Chalker v. Birmingham & N. W. Ry. Co., 249 U.S. 522, 39 S.Ct. 366, 63 L.Ed. 748, Travis v. Yale & Towne Mfg. Co., 252 U.S. 60, 40 S.Ct. 228, 64 L.Ed. 460, we would be inclined to consider the discriminatory legislation here also in violation of Article IV, § 2, as extended to Alaska by § 3 of the Organic Act, were it not for the holding in Haavik v. Alaska Packers Ass'n, supra, that Article IV, § 2, had no application to Alaska. There the court made specific reference to § 3 of the Organic Act but apparently assumed without discussion that it did not operate to make Article IV, § 2 applicable to Alaska. In Duncan v. Kahanamoku, 327 U.S. 304, 317, 66 S.Ct. 606, 90 L.Ed. 688, the court expressly held that § 5 of the Hawaiian Organic Act, 48 U.S.C.A. § 495, which is identical with § 3 of the Alaska Organic Act, operated to extend certain constitutional provisions to the Territory of Hawaii.

Whether at some future time the Supreme Court will give a like effect to § 3 of the Alaskan Organic Act, as it failed to do in the Haavik case, we are not here called upon to speculate.

Judgment is reversed with instructions to enter judgment in accordance with this opinion.

DENMAN, Chief Judge.

I dissent.

(A) *Because the gravamen of the court's opinion is that the territory of Alaska has no more power over taxation than if it were a state. This is in square conflict with Haavik v. Alaska Packers Association, 263 U.S. 510, 44 S.Ct. 177, 68 L.Ed. 414, which held valid an Alaska license tax on nonresident fishermen not imposed on resident fishermen.*

The ground of the Haavik decision is that the Territory of Alaska has the same power of taxation that Congress has. In that case Haavik, "While residing in California * * * was employed by appellee corporation, owner and operator, to serve as seaman and fisherman upon the sailing vessel Star of Finland. He sailed upon her to Alaska, and served with her there while she engaged in fishing, from the middle of May, 1921, until the middle of September." That is to say, the fisherman upon whom the license fee was imposed was carried by his employer into commerce between the state and the territory and fished while in the territory for his employer. Haavik was more certainly in interstate commerce than the fishermen in the instant case, of whom there is proof that the vast body of them

were transported to Alaska by employers to be there employed by the employers in fishing.

In this situation the Supreme Court held that the territory had the same power of taxation as Congress itself, as follows: "Plainly, we think, the Territorial Legislature had authority under the terms of the Organic Act to impose both the head and the license tax, unless, for want of power, Congress itself could not have laid them by direct action. Talbott v. [Board of Com'rs] Silver Bow County, 139 U.S. 438, 448, 11 S. Ct. 594, 35 L.Ed. 210; Binns v. United States, 194 U.S. 486, 491, 24 S.Ct. 816, 48 L.Ed. 1087; Alaska Pacific Fisheries v. United States, 248 U.S. 78, 87, 39 S.Ct. 40, 63 L.Ed. 138; Territory of Alaska v. Troy, 258 U.S. 101, 42 S.Ct. 241, 66 L.Ed. 487."

Continuing in the opinion, it reiterates that "We are not here concerned with taxation by a state." Because it was not taxation by a state but by a territory with Congressional power over taxation, the court holds: "The license tax cannot be said to conflict with section 2, art. 4, of the Constitution—'The citizens of *each state* shall be entitled to all privileges and immunities of citizens in the several states.' It applies only to nonresident fishermen; citizens of every state are treated alike. Only residents of the territory are preferred. · This is not wholly arbitrary or unreasonable, and we find nothing in the Constitution *which prohibits Congress* from favoring those who have acquired a local residence and upon whose efforts the future development of the territory must largely depend. See Alaska Pacific Fisheries v. United States [248 U.S. 78, 87, 39 S.Ct. 40, 63 L.Ed. 138], and Alaska Fish Co. v. Smith, 255 U.S. 44, 47, 48, 41 S.Ct. 219, 65 L.Ed. 489." (Emphasis supplied.)

In support of its decision that the territory has the same power of taxation as Congress, the court cites the case of Territory of Alaska v. Troy, 258 U.S. 101, 42 S. Ct. 241, 242, 66 L.Ed. 487. This case involved the Merchant Marine Act of June 5, 1920, 46 U.S.C.A. § 883, requiring merchandise transported by water to move in vessels built in and documented under the laws of the United States and owned by United States citizens. Alaska was excluded from the limitations. The court held, inter alia, that the legislation did not violate § 8, Article I of the Constitution, which provides that "All Duties, Imposts and Excises shall be uniform throughout the United States." Of this, the Supreme Court stated, "The questioned regulation relates *directly to commerce* and clearly is not within the usual meaning of the words of section 8, art. 1, of the Constitution." (Emphasis supplied.) It held that, because Alaska was a territory and not a state, Congress had the power to make such a regulation of commerce.

Incidentally, the official report of the Haavik case shows that the appellant contended that the license tax of $5 was invalid because "Alaska permits anyone to take salmon for any purpose, but discriminates between residents and nonresidents in a matter in which interstate commerce alone is involved," on which the court held that "none of the points relied upon by appellant is well taken, and the decree below must be affirmed." In view of the Supreme Court's reliance on Territory of Alaska v. Troy, supra, involving interstate commerce, this court's position that the Supreme Court did not consider the interstate factor in the Haavik case is clearly untenable.

I further dissent:

(B) *Because the court's opinion fails to apply to a territory's legislation the many cases holding the presumption of constitutionality of its license tax and because of its failure to recognize that the attacking fishermen have not maintained their burden of proof that the fee of $50 per year for the protection of its laws for nonresident fishermen is arbitrary or excessive.*

It has long been established that there is a presumption against the attacking party that an assailed statute is constitutional. Supported by a long line of decisions, the Supreme Court in the recent case of Davis v. Department of Labor, 317 U.S. 249, at page 257, 63 S.Ct. 225, at page 229, 87 L.Ed. 246, speaks of its *heavy* reliance upon the presumption, stating: "The problem here is comparable to that in another field of constitutional law in which courts are called upon to determine whether particular state

acts unduly burden interstate commerce. In making the factual judgment there, we have relied *heavily* on the presumption of constitutionality in favor of the state statute." (Emphasis supplied.)

Likewise it has long been established that in an attack on a state taxing statute the burden of proof is on the attacking party. State Board of Tax Commissioners v. Jackson, 283 U.S. 527, 51 S.Ct. 540, 75 L.Ed. 1248.[1] Basing their decision on fourteen prior decisions, the Supreme Court in Metropolitan Casualty Ins. Co. v. Brownell, 294 U.S. 580, 582, 55 S.Ct. 538, 540, 79 L.Ed. 1070, states the rule with respect to attacks on a statute as violating the equal protection clause of the Fourteenth Amendment and the reasons underlying it as follows: "It is a salutary principle of judicial decisions, long emphasized and followed by this Court, that the burden of establishing the unconstitutionality of a statute rests on him who assails it, and that courts may not declare a legislative discrimination invalid unless, viewed in the light of facts made known or generally assumed, it is of such a character as to preclude the assumption that the classification rests upon some rational basis within the knowledge and experience of the legislators. A statutory discrimination will not be set aside as the denial of equal protection of the laws *if any state of facts reasonably may be conceived to justify it.*" (Emphasis supplied.)

In accord with the "assumption that the classification rests upon some rational basis within the knowledge and experience" of the Alaska legislature, we held in Anderson v. Smith, 9 Cir., 71 F.2d 493, 495, that a license fee of $25 per annum on nonresident fishermen was not arbitrary or unreasonable, even though the resident fishermen's license fee was only $1 per annum. On this we accepted the theory of the Haavik case, which, 263 U.S. at page 515, 44 S.Ct. 177, 68 L.Ed. 414, gives as a ground of legislative classification by which the license fee was charged to nonresidents and not to residents, the development of this remote frontier territory by its permanent residents.

These fishermen engaged in catching fish well could be "conceived" by the Alaska legislature as escaping all the various Alaska taxations of residents for municipalities and school districts and otherwise and likewise they are not being subject to the increased cost of living caused by the license taxes on many enterprises which increase the cost of services and goods of all kinds for which the residents are required to pay. Certainly appellants have not sustained their burden of proof that they are subject to other forms of taxation and its effect on the cost of living of residents. Nor has the burden of proof been maintained that there has been any change in the peculiar conditions existing in Alaska in 1924 as distinguished from the economically developed states warranting a classification of nonresidents from residents, of which the Supreme Court said in the Haavik case that the license tax "applies only to nonresident fishermen; citizens of every state are treated alike. Only residents of the territory are preferred. This is not wholly arbitrary or unreasonable, and we find *nothing in the Constitution* which prohibits Congress from favoring those who have acquired a local residence and upon whose efforts the future development of the territory must largely depend." (Emphasis supplied.)

The question then is whether the increase of the license for the benefit of the Alaska government to nonresident fishermen from the $25 of Anderson v. Smith, supra, to the present $50, is so great that it makes the larger amount unconstitutionally excessive.

The law creating the $25 fee was enacted in 1933, Laws 1933, c. 30; that here for $50 in 1949. This court has repeatedly taken judicial notice of the enormously increased costs of all kinds in the last decades. Southern Pacific Co. v. Zehnle, 9 Cir., 163 F.2d 453, 454. Cf. Annotation 12 A.L.R.2d 611. In 1933 when the nonresident fee was fixed at $25 the country was in the grip of the great depression, wages were low and the National Recovery and Gold Demonetization acts were passed to *increase* prices. In this sixteen years be-

---

1. Recently restated by the Supreme Court in Norton Co. v. Department of Revenue of State of Ill., 340 U.S. 534, 71 S.Ct. 377.

tween then and 1949 was the second world war, with the great and now remaining rise in prices and rents which led to federal legislation to hold them from further rise. The cold war prevailing in 1949 well could have been considered by the Alaskan legislature as no restraint on their increase.

Not only were all the costs of Alaskan government greatly increased, but the same is true of the costs of collection from the hundreds, if not thousands, of evading non-resident fishermen hiding from the tax collector and the prosecution of the offenders as shown by the evidence adduced at the trial. Of the increased costs of collection, it is not necessary to show that they equalled the amount collected, for there is presumed to be an excess of collections over cost to constitute territorial income for its governmental services rendered to and available to the nonresidents, held a valid purpose in the Haavik and Anderson cases.

(C) *I dissent further from the failure to construe Section 41 of the Civil Rights Act, upon which appellants rely here.*

The section of the Civil Rights Act here invoked, 8 U.S.C.A. § 41, reads:

."§ 41. Equal rights under the law

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is *enjoyed by white citizens,* and shall be subject to like \* \* \* licenses \* \* \* and to no other. R.S. § 1977." (Emphasis supplied.)

The words "white citizens" have been interpreted as giving this equal protection to citizens and aliens of all races. So interpreted, the Act means that "All persons [of all races] within the jurisdiction of the United States shall have the same right \* \* \* to the full and equal benefit of all laws \* \* \* as is enjoyed by white citizens, and shall be subject to *like* \* \* \* licenses \* \* \* of *every kind,* [as those imposed on white citizens] and to no other." (Emphasis supplied.)

Cf. Collins v. Hardiman, 341 U.S. 651, 71 S.Ct. 937, 942, where the court construed

the conspiracy clause of the Act as not applying to the civil rights interfered with by "a lawless political brawl, precipitated by a *handful of white citizens against other white citizens,"* after stating the purpose of the Act is "to put the lately freed Negro on an equal footing before the law with his former master."

The judgment should have been affirmed.